**Mark DEWES, Plaintiff,**

**v.**

**INDIAN HEALTH SERVICE, PUBLIC HEALTH SERVICE; Bureau of Indian Affairs; Department of Health, Education and Welfare; National Health Service Corps and United States of America, Defendants.**

**Civ. No. 79–3002.**

United States District Court, D. South Dakota, C. D.

Oct. 31, 1980.

J. M. Grossenburg, Day, Grossenburg & Whiting, Winner, S. D., for plaintiff.

John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

## CASE SUMMARY

The complaint was filed in this case on January 17, 1979, under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. It alleged that the medical personnel of the National Health Service Corps had negligently failed to diagnose and properly treat plaintiff's arm and leg injuries, that defendants were negligent in employing a physician whose competence was in question, that defendants failed to advise plaintiff of the risks and hazards of the treatment which they gave plaintiff, and that plaintiff did not give a free or informed consent to his treatment by defendants. Plaintiff claimed that this negligence resulted in the loss of his foot and in the loss of much of the function of one arm, and asked damages of $525,000. Trial to the Court of this case was held in Deadwood, South Dakota. Following the trial, a transcript was prepared, and the parties submitted post-trial briefs. After due consideration of this material, and all the evidence, the Court finds defendant liable to the extent hereafter set out.

## FACTUAL BACKGROUND

This case has its origins in a motorcycle-automobile accident in which plaintiff was involved at about 8:00 p. m., C.D.T., July 2, 1977, near Mission, South Dakota. Plaintiff received a variety of injuries, including a broken arm and leg. He was taken first to a hospital in Rosebud, but was quickly transferred to the Martin hospital. The surgeon at the Martin hospital was a Dr. George McMurtrey, who had been placed there as an employee of the National Health Service Corps, an agency of the United States Department of Health, Education and Welfare.

Plaintiff's parents arrived at the Martin hospital at about 10:00 p. m., M.D.T., shortly after plaintiff had been taken there, and saw him briefly in the emergency room. Plaintiff's parents attempted to talk to him, but plaintiff was then unable to carry on a conversation, though he seemed aware of their presence.

Plaintiff's parents also had a short conversation with Dr. McMurtrey at that time. Plaintiff's mother testified that while Dr. McMurtrey told them that "they were going to do some . . . work with" plaintiff, he did not inform them that an operation was contemplated.

Apparently believing that the fracture in the left elbow was compressing the blood vessels and had cut off circulation to the hand, Dr. McMurtrey focused his attention on that limb. Dr. McMurtrey testified that he told plaintiff that something was going to have to be done, that plaintiff understood this, and signed a consent form. This

form, which authorized a "closed and/or open reduction of left tibia, fibula or humerus", and is signed "Mark A. Dewes", is dated July 2, 1977, at 9:30 p. m.

Plaintiff testified that he did not remember this conversation, Dr. McMurtrey or any treatment at the Martin hospital. Dr. McMurtrey then had plaintiff taken into surgery at about 10:45 p. m., where he first attempted to reduce the fracture without surgery, but was unsuccessful. Dr. McMurtrey then decided to perform an open reduction of the fracture, lifting the bone fragment off the blood vessel and attaching it to the bone shaft with four screws and a small plate.

At some point in the course of this treatment, according to plaintiff's mother in testimony that was not denied, Dr. McMurtrey and another person came back to the coffee room where plaintiff's parents were waiting, and had coffee while they waited for the plate to sterilize. This, according to Mrs. Dewes, was the first time that she had heard that an operation was being performed. They did not sign any consent form for the operation, although Mrs. Dewes did sign two consents for transfusions, dated July 2, 1977, at 11:00 p. m.

Dr. McMurtrey testified that he knew the only plate available to him at Martin would be too small to satisfactorily reduce the fracture, that the bone fragments were not going to stay put, and that plaintiff would require further orthopedic care. He felt, however, that this was justified to achieve relief of the circulation problem.

No surgery was attempted on plaintiff's left leg, which was also broken.

Following the operation, plaintiff became very ill, and developed lung complications. He was transferred to a Rapid City hospital on July 6, 1977. Over the period of the next several weeks, plaintiff developed gangrene in his foot, which eventually resulted in its amputation in late July.

Dr. Berkebile, an orthopedic surgeon in Rapid City, took over plaintiff's case around August 1, 1977. After examining plaintiff's arm, he concluded that the fracture was unstable and should be reoperated on. Dr. Berkebile performed a second open reduction on plaintiff on August 9, 1977.

It is clear from the evidence that the particular elbow fracture plaintiff suffered was a difficult one to treat. According to Dr. Berkebile, after one open reduction there would usually be a loss of 20 to 30 degrees of arm motion out of a normal 150 degree range. Dr. Berkebile testified that after the second open reduction, plaintiff had lost a total of 70 degrees, or about one-half of his motion.

The method chosen by Dr. McMurtrey seems to be a recognized method in dealing with this type of situation, as Dr. Berkebile, Dr. Hayes, Dr. Blunck, and the defendant's expert witness, Dr. Assimaupoulos, all seem to agree. It also seems clear, however, that this method of open reduction was only one of several alternatives, and not necessarily the best one. Dr. Assimaupoulos conceded that this type of fracture can be treated by manipulation and by traction, as well as by open reduction. Similarly, Dr. Berkebile said that besides open reduction, the fracture could also have been put in traction either by drilling a small wire across one of the forearm bones and putting traction to the bone itself, or possibly by applying traction to the skin.

While recognizing the possibility of performing an open reduction, Dr. Berkebile would have employed traction, and was of the opinion that the majority of orthopedic surgeons would also have used traction. Dr. Blunck, another orthopedic surgeon, bears this out. The testimony of Dr. Robert Hayes, a general practitioner in the Martin area, also indicates that traction would have been the preferred methodology.

From the small amount of evidence adduced on the loss of plaintiff's foot, it does not appear that the loss can be attributed to anything but the initial injury.

## DISCUSSION

### I. *Liability*

#### A. *Informed Consent*

Several theories of recovery were advanced at trial and in plaintiff's post-trial briefs, but liability is herein determined against defendant on plaintiff's theory that the first open reduction on the elbow was performed without informed consent. Since defendant's liability is to be determined under state law, 28 U.S.C. § 2674, the Court turns to the declarations of the South Dakota Supreme Court on this point.

The most recent and most thorough examination of the informed consent theory in medical malpractice cases in South Dakota is found in *Cunningham v. Yankton Clinic, P. A.*, 262 N.W.2d 508 (S.D.1978).[1] There, the court held that:

> A doctor has the duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures, if such are reasonably appropriate, so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure.

262 N.W.2d at 511. The court still seemed to suggest that there might be a need for "expert testimony to establish the existence or the extent of a physician's duty to disclose risks", 262 N.W.2d at 511. The court did not reach that issue, however, because the defendant-doctor himself had admitted that "the standards of the medical practice in his community would require him to advise [plaintiff] of the ramifications of her treatment." 262 N.W.2d at 512.

Though the *Cunningham* court did not expressly address the question of the causal connection between the lack of disclosure and injury to the patient, the authority the court cited in support of its opinion as well as the result reached leave no doubt as to the South Dakota position on causation. *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis.2d 1, 227 N.W.2d 647 (1975), one of several Wisconsin cases cited in *Cunningham*, relied heavily on the seminal decision in *Canterbury v. Spence*, 464 F.2d 772, (D.C. Cir. 1972), cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), and quoted extensively from *Canterbury* on the issue of causation. *Canterbury* states that:

> An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is equally without consequence.... A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it ... [the issue is to be resolved] on an objective basis in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.

464 F.2d at 790–91. *Cunningham's* holding makes it clear that this is the rule South Dakota has adopted. In *Cunningham*, the defendant-doctor had reduced plaintiff's fractured wrist by inserting two pins in plaintiff's arm. The pin in the elbow area later caused infection, resulting in severe pain, and the doctor removed the pin after telling plaintiff that removal would cause some slippage of the fracture, that two surgical procedures could be used to correct the slippage, and that unless removed, the pin would cause continued pain. The doctor did not tell plaintiff that removal, even with surgical correction, would cause permanent disability and deformity of the wrist, nor did he tell her that the infection could be treated by antibiotics. Following the removal of the pin, there was severe slippage of the fracture, resulting in twenty to twenty-five percent permanent wrist disability and a serious deformity. Assessing this evidence, the court concluded that "had plaintiff known of the probable results of the removal she would have elected to treatment with antibiotics", 262 N.W.2d at 512, a statement that clearly indicates the *Canterbury* approach to causation was fol-

1. *See also Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808 (1964).

lowed: non-disclosure of risks and alternatives where disclosure would have persuaded a reasonable person to choose an alternative treatment.

■ With this in mind, the Court turns to the facts before it. First, it is to be noted that, as in *Cunningham*, the doctor himself testified to the standards of disclosure which should have been followed. In response to questions of whether medically significant alternatives for treatment should be disclosed to a patient, and if a patient was not in a condition to understand this information, it should be given to his parents, Dr. McMurtrey stated that this was the standard of care in Martin in 1977, and the one he attempted to follow.

It seems very clear from the evidence that no meaningful consent was ever given to Dr. McMurtrey's open reduction of plaintiff's left arm. While plaintiff did evidently sign a consent form, Dr. McMurtrey himself recognized that plaintiff was not in full control of his faculties at the time he did so. By plaintiff's own testimony and that of his mother, it is apparent that whatever was said to plaintiff, he was in no condition to understand or properly consent. Under Dr. McMurtrey's own standards, then, he should have explained to plaintiff's parents what he was about to do, told them of the ramifications of his open reduction, i. e., that it would call for a second operation, and give them an opportunity to choose between this method and any alternatives that were available.

■ The defense argues that this was an emergency situation, where the necessity of full disclosure was not required. Defendant cites the statement in *Cunningham* that:

> There is a recognized exception to the rule that a physician must obtain his patient's consent both to an operation or treatment where an emergency situation exists and immediate action is necessary to preserve the patient's life or health and it is impracticable to first obtain the patient's consent which the surgeon deems to be immediately necessary.

262 N.W.2d at 511. The Court cannot find this exception applicable to this case. Dr. McMurtrey knew that plaintiff's parents were nearby. He saw them when they first arrived, and he sat near them having coffee after plaintiff had already been taken into surgery. Yet, he did not explain the options available nor did he obtain their consent to the open reduction surgery. If the case was such that he could take time to drink coffee, it cannot be said that a true emergency situation existed.

■ It might also be argued that there was no viable alternative available to Dr. McMurtrey except open reduction, and that therefore obtaining consent to this operation was an empty formality. The record does not support this contention. Though defendant's expert was of the opinion that Dr. McMurtrey had tried traction and found that it would not work, cross-examination of Dr. Assimaupoulos showed that he based this opinion on an assumption that the words "closed reduction" in Dr. McMurtrey's operative report meant both "traction" and "manipulation".[2] The testimony of a nurse who was present at the operation does not substantiate this assumption. Nurse Good stated that Dr. McMurtrey had tried to manually manipulate the fracture, but did not try any skeletal traction. This Court must conclude, then, that skeletal traction was still a valid alternative at the time of the operation, and that plaintiff or his parents should have been apprised of it.

■ Defendant also argues that the loss of function in plaintiff's arm was not shown to be a result of Dr. McMurtrey's treatment. This contention is based mainly on the testimony of Dr. Assimaupoulos that the current disability of plaintiff's arm could be attributable to four causes: the original injury, displacement of the fracture during the several times plaintiff was transported, Dr. McMurtrey's operation and

2. It could be observed that this report was not dictated until November 21, 1977, apparently after plaintiff's attorney requested it.

Dr. Berkebile's operation. It must be observed in regard to this, however, that two of these possible causes have to be laid at Dr. McMurtrey's door, since Dr. Berkebile's second operation was due mainly to the fact that Dr. McMurtrey was unable to satisfactorily reduce the fracture in the first operation, as Dr. McMurtrey himself realized. It is clear, as Dr. Berkebile testified, that doing an open reduction was much more difficult the second time around, and that the necessity of re-operating on the fracture was the primary cause of plaintiff's loss of motion in his arm.

It is the finding of this Court, then, that Dr. McMurtrey had a duty to inform plaintiff's parents of at least two alternative forms of treatment for plaintiff's left arm at Martin on July 2, 1977: skeletal traction and open reduction with a plate too small to do the job properly. Dr. McMurtrey should also have told plaintiff's parents of the very significant risk that lay ahead if they chose open reduction: that a second operation would be necessary on the arm, resulting in additional loss of motion. It is plain that Dr. McMurtrey did not fulfill this duty. The Court also finds that, under the rule it follows, a prudent patient or his parents, in a position like that in which plaintiff and his parents were placed, after being informed of all this, would have declined the treatment which Dr. McMurtrey employed. The defendant therefore must be held liable for the loss of function in plaintiff's left arm.

B. *Duty to Consult and Duty to Employ Competent Physician*

Plaintiff contends, as an alternate basis of recovery, that the nature of this fracture was so complicated that a general surgeon in Dr. McMurtrey's position was under a duty to consult and refer, rather than to undertake the treatment of it himself. Under the generally recognized standard that "a physician's duty to advise his patients to consult a specialist . . . arises when the physician knows, or should know, that he does not possess the requisite skill, knowledge or facilities to properly treat a patient's ailment", 35 ALR 3d 349, 358 (1971), the Court cannot conclude from the evidence before it that Dr. McMurtrey violated this duty. There is not sufficient proof that the open reduction performed was beyond Dr. McMurtrey's competence as a surgeon or that the operation itself was not skillfully done, given the circumstances. As pointed out before, all the doctors in the case testified that the method chosen by Dr. McMurtrey was a recognized one, even though several of the doctors would not have used it themselves. *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959). The evidence in this case indicates that many of these fractures have been treated by general surgeons in South Dakota, and though, in ideal conditions, it might have been best to immediately transfer plaintiff to a specialist in Rapid City, it cannot be said that Dr. McMurtrey was negligent for failing to do so.

Plaintiff also makes an argument that because Dr. McMurtrey had voluntarily surrendered his medical license in Nebraska in 1976, signing a form that included the phrase "I am not currently competent to practice medicine and surgery in the State of Nebraska", the National Health Service Corps must therefore be liable for employing an incompetent physician. This theory finds no support in South Dakota law. As the South Dakota Supreme Court held in *Fjerstad v. Knutson*, 271 N.W.2d 8, 14 (S.D.1978), "A physician is negligent if his treatment is improper, but failure to have a license is not enough to render the treatment automatically deficient". The fact that Dr. McMurtrey might have surrendered his license does not furnish a basis for this Court to abandon the doctrine of proximate cause, regardless of what language the surrender form may have contained.

The foregoing opinion constitutes the Court's findings of fact and conclusions of law on the issue of liability.