William J. SALIS, and Alice Salis,
his wife

v.

UNITED STATES of America.

Alice SALIS

v.

UNITED STATES of America.

Civ. Nos. 79–693, 79–1528.

United States District Court,
M. D. Pennsylvania.

Sept. 10, 1981.

John Paul Curran, Philadelphia, Pa., for plaintiffs.

James Walker, Asst. U.S. Atty., Scranton, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. INTRODUCTION

The plaintiffs in this case seek damages for the alleged malpractice of certain physicians employed by the United States

Government. William Salis suffered serious injuries, including loss of his left leg, after he underwent an angiogram at the Wilkes-Barre VA Hospital in January 1978. The complainants contend that they may recover because: (1) the decision to employ the procedure constituted negligence, and (2) the patient's rights under the doctrine of informed consent were violated. This matter was tried without a jury on September 29 and October 1-2, 1980. All of the litigants agree that subject matter jurisdiction rests on the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and Pennsylvania law governs the substantive aspects of the suit. *Harrigan v. United States*, 408 F.Supp. 177, 185 (E.D.Pa.1976); *Ciccarone v. United States*, 350 F.Supp. 554, 563 (E.D.Pa.1976), aff'd 486 F.2d 253, 257 (3d Cir. 1973). After a careful examination of the two theories, the court finds that although there was no negligence in the application of the angiogram, the defendants did in fact transgress the requirements of informed consent and the patient suffered serious injury as a result of the breach. Accordingly, damages shall be awarded.

## II. FINDINGS OF FACT

1. The plaintiffs in this litigation are a married couple. William Salis is a fifty-six year old, life-long resident of Luzerne County, Pennsylvania. Alice Salis is his wife. The plaintiffs have two children, both of whom are adults. Throughout this Memorandum and Order, the name "Salis" shall refer to William Salis unless otherwise indicated.

2. The defendant is the United States of America acting through its agency, the Veterans Administration ("VA").

3. Salis served in the United States Navy during World War II. He saw action in the Atlantic and Mediterranean theaters.

4. With the exception of four years spent working in the mines, Salis's employment career consisted of clerical work.

5. Salis retired in January of 1974 at the age of forty-nine.

6. Prior to retirement, Salis received 60 per cent disability benefits from the VA on the basis of pernicious anemia, which he contracted during his military service.

7. Since his retirement, Salis has received 100 per cent disability benefits from the VA. He cannot work because he suffers from the following service-related illnesses: pernicious anemia, a heart condition, and thyroid problems.

8. Salis suffered from chest pains during 1972-74. His condition became increasingly worse as time progressed.

9. From January to April of 1974, Salis was at the VA Hospital in New York City receiving treatment for this condition.

10. During the course of his hospitalization, Salis twice underwent angiography and cardiac catheterization.

11. Angiography is a medical procedure in which a catheter is inserted into a blood vessel and an iodine-based dye is introduced into the circulatory system. The dye then outlines the vessels which are photographed by x-rays. Cardiac catheterization involves the same procedure with insertion of the catheter in the area near the heart.

12. The first of these procedures, performed on February 5, 1974, was designed to help diagnose a course of treatment for Salis's chest pains. As a result of the procedure, he suffered from chills and required medication.

13. The staff at the New York City VA Hospital determined that Salis suffered from a severe case of arteriosclerotic heart disease, as well as hypothyroidism and pernicious anemia.

14. On April 2, 1974, Salis underwent open heart surgery for five hours and twenty-five minutes including a triple coronary bypass operation.

15. On April 22, 1974, Salis received a second cardiac catheterization to evaluate the results of the triple coronary bypass.

16. Salis again experienced chills after the second catheterization.

17. Salis also suffered an embolism, or clot, in his right leg after the second procedure.

18. The embolism was induced by the catheter used to perform the angiography. Salis suffers from arteriosclerosis, or "hardening of the arteries," which is caused by the buildup of plaque, or fatty material, along the walls of his blood vessels. The catheter caused the clot by either dislodging plaque or in some other way injuring the circulatory system.

19. The embolism was removed surgically.

20. The triple coronary bypass relieved Salis's angina.

21. In 1976, Salis began to experience pains in his right leg while walking.

22. During the early part of 1977, Salis reported these pains to his regular physician, Dr. Jackier of the VA Hospital in Wilkes-Barre.

23. These pains were caused by "intermittent claudication," or pain caused by decreased circulation, which arises when the patient is either exercising or walking. The symptoms are relieved by sitting down or resting. The decreased circulation giving rise to the claudication was caused by Salis's arteriosclerosis.

24. In June 1977, Salis was admitted to the Wilkes-Barre VA Hospital for treatment of the pains in his right leg.

25. During his hospitalization in June 1977, Salis underwent a translumbar aortogram, a type of angiogram in which the dye is inserted through the aorta.

26. After the angiogram, Salis again experienced chills.

27. The results of the translumbar aortogram were not completely satisfactory, because the x-rays did not yield pictures of many small blood vessels. This problem arose because the dye became too diluted to outline these vessels. The Wilkes-Barre VA staff, nonetheless, was able to conclude that Salis's leg pains were primarily caused by his arteriosclerosis. He was discharged and directed to return in six months for further diagnosis.

28. The VA staff prescribed Arlidin for use by Salis during the six month period beginning in June 1977. The physicians took this step to determine if the patient's condition could be treated adequately with drugs and other non-surgical therapy.

29. Due to a good faith misunderstanding between the patient and his physicians, Salis did not take the drug regularly. At this point in time, it cannot be determined if a course of non-surgical therapy would have succeeded.

30. Salis's intermittent claudication essentially remained stable during the six month observation period except that he began to experience pain after shorter periods of walking.

31. In January 1978, Salis returned to the VA Hospital as directed. He was still complaining about the pain in his right leg, which he felt was seriously interfering with his life style. Salis was very interested in receiving effective treatment for the claudication. Nonetheless, his condition was not so desperate that he would have undergone risky surgical and diagnostic procedures before exhausting all reasonable avenues of non-surgical therapy.

32. The Wilkes-Barre VA staff considered surgery a possible form of treatment. Salis's physicians decided that he should undergo an angiogram in order to provide x-rays of the circulatory system in the right leg. These pictures were to be used to assess the possibility of surgery.

33. From their discussions with Salis, the VA doctors were aware of the chills the patient experienced after his previous applications of angiography. Benadryl was prescribed to counteract any allergic reactions that the patient might experience during the test.

34. The attending physicians did not review the records of Salis's 1974 angiography in New York. They did, however, obtain adequate information to

proceed from various interviews with the patient. Reference to the New York records would not have affected the decision to resort to angiography.

35. This contemplated procedure involved the following risks for Salis: (1) adverse reaction to the dye, (2) injury from insertion of the catheter, and (3) creation of a clot caused by the breaking off of plaque that had collected along the vessel walls.

36. The risk of significant complications in the case of an average angiogram is in the vicinity of 1 to 2 per cent.

37. Salis was not warned of these dangers although his doctors did discuss with him the possibility of a hematoma.

38. If warned of these dangers, Salis would not have undergone the angiogram.

39. The angiogram was performed on January 12, 1978.

40. The radiologist who performed the angiogram inserted the catheter into Salis's left femoral artery. This action was taken even though the purpose of the procedure was to take x-rays of Salis's right leg.

41. The choice of the left femoral artery was made because the pulse in Salis's right femoral artery was weak. For that reason, the left artery appeared to be a safer point of entry.

42. The angiogram procedure dislodged plaque from the walls of Salis's blood vessels.

43. These plaques showered into Salis's left leg and left foot, thereby causing massive clotting.

44. The angiogram procedure also caused an acute renal shut-down, or kidney failure, because of either the shower of plaque or a reaction of the kidneys to toxic substances in the dye.

45. Late in the evening of January 12th, the lower sections of Salis's left leg began to show signs of the embolism. Specifically, his foot and toes became cold, pale, and painful.

46. The Wilkes-Barre VA staff attempted to remedy the situation, first with drugs and then by performing an embolectomy of the left femoral artery. The embolectomy was performed the day after the angiogram.

47. From a medical point of view, the treatment administered to Salis between January 12th and January 16th was appropriate. Unfortunately, these measures failed to restore circulation to the lower portions of Salis's left leg and gangrene developed.

48. On January 16, 1978, Salis was transferred to Wilkes-Barre General Hospital. At that point, he was in a very toxic state due to uremia and the accumulation of protein products in his blood caused by the kidney shut-down. The situation had developed to the point that Salis was near death.

49. The primary purpose for this transfer was to move Salis to a facility where hemodialysis could be administered to compensate for the kidney failure.

50. Salis was placed on a hemodialysis machine until his condition improved to the point that he could undergo a major operation.

51. Once Salis was able to undergo the operation, the gangrenous portions of his left leg were amputated. The gangrene had developed to the point that the amputation had to be made three to four inches above the knee.

52. Salis underwent hemodialysis three days a week for eight to ten weeks. After that time, his kidneys regained their ability to function.

53. As a result of the January 1978 angiogram, Salis suffered the following injuries:

a) Loss of his left leg with resulting pain, suffering and inconvenience;

b) Pain, suffering, and discomfort from the renal shut-down;

c) Significant loss of mobility;

d) Discomfort in adjusting to the prosthesis to replace his left limb;

e) Mental distress from the loss of the limb and extended hospitalization and other therapy.

## III. NEGLIGENCE

The negligence claim is straightforward. Angiography is strictly diagnostic and has no purpose other than to provide physicians with information to assist them in deciding if a patient should undergo an operation. The complainants maintain that surgery was clearly inappropriate in light of Salis's condition in January 1978 and, for that reason, the VA physicians had no valid medical reason to subject the patient to the perils inherent in an angiogram. Thus, the plaintiffs contend that the risks of the procedure so greatly outweighed the possible benefits that mere performance of the test constituted negligence, even if the mechanics were performed properly.

■ Under Pennsylvania law, the legal principles that govern this claim are simple. Barring an express warranty, a physician is not liable merely because a particular form of therapy ends unfavorably. *Smith v. Yohe,* 412 Pa. 94, 98, 194 A.2d 167 (1963). To prevail, a plaintiff must demonstrate that the defendant either failed to possess the skill and knowledge required for undertaking the treatment or neglected to exercise the degree of care over the patient. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 595, 417 A.2d 196 (1980). *Incollingo v. Ewing,* 444 Pa. 263, 275, 282 A.2d 206 (1971); *Collins v. Hand,* 431 Pa. 378, 383, 246 A.2d 398 (1968). A specialist, moreover, is held to a higher standard of conduct than a general practitioner. *McPhee v. Reichel,* 461 F.2d 947, 951 (3d Cir. 1972).[1] In applying these precepts, it is first necessary to dispose of certain factual issues which are tangential to the main controversy.

Throughout the course of this litigation, the plaintiffs have implied that VA Hospitals generally offer their patients inadequate medical care.[2] Apparently in an attempt to bolster this charge, testimony was introduced which challenged many aspects of the treatment that Salis received during 1977 and 1978. When placed in proper perspective, these allegations either collapse in the face of contrary evidence or fail to support the main negligence theory, *i. e.,* the charge that VA doctors were negligent in ordering the angiogram.

■ One such issue concerns the decision of Dr. Wendel, the radiologist who performed the angiogram, to insert the catheter into the left femoral artery in order to take pictures of the circulatory system in the right leg. Dr. Bendersky, the complainant's expert, questioned the procedure on two grounds. Initially, he thought that this indirect approach was less effective in obtaining satisfactory pictures. Second, the witness stated that the procedure was unnecessarily dangerous since it both required manipulation of the catheter in order to gain access to the vessels of the right leg and also exposed the left leg to the perils incidental to angiography.

Three factors, however, convince the court that the course chosen did not amount to negligence. First Dr. Bendersky's testimony did not support a claim that entry through the left side amounted to a lack of due care. On the contrary, in concluding his testimony on this point he simply opined that the increased risks merited special warnings with regard to informed consent.[3] Next, after hearing the testimony of Dr. Wendel and other witnesses produced by the Government, the court is satisfied that none of the dangerous catheter manipulations described by Dr. Bendersky occurred. Lastly, the choice of the left femoral artery rested on sound medical judgment. Dr. Wendel testified that he did not specifically remember why he selected that course of action. Based on his previous experience, however, he stated that probably he either could not find a strong enough pulse on the right side to proceed or suspected that a

1. The attending physicians in the instant case are specialists in surgery and radiology.

2. According to the complainant's post-trial brief, a significant portion of the testimony supports the proposition "that, as a class, the patients of the Veterans Administration are treated with a different standard of care than patients in the general population." *See* Document 43 of the Record at 12–14.

3. That issue will be discussed in Part IV, *infra.*

left side entry would be safer in view of the advanced arteriosclerosis in the right leg.[4] According to Dr. Lynch, the defendant's expert, Salis's medical records reflected the fact that the patient had no femoral pulse on the right side in both June 1977 and January 1978. Based on this testimony, the court finds that the selection of the left side for insertion did not constitute negligence.

Second, the parties spent a considerable amount of time litigating whether or not Salis suffered from an allergic reaction to the dye used in angiography. Dr. Bendersky testified that the "chills" the patient experienced during his previous hospitalizations indicated that he had an allergy to the iodine-based dye and, thus, should not undergo an angiogram "unless precautions were taken in the future." *See* Document 37 of the Record at 23. The witness was especially critical of the failure to review the records of Salis's New York hospitalization, which noted the possibility that the patient suffered from such a condition. Dr. Cremone, one of Salis's attending physicians, knew of the reactions and prescribed the use of Benadryl, a drug used to relieve symptoms caused by exposure to drugs. The question is whether this safety measure was enough to satisfy the physician's responsibility of due care.

Several factors must be noted with regard to this allergy issue. First, the symptoms Salis experienced after his previous angiogram were not particularly noteworthy from a medical point of view. Dr. Wendel explained that "chills" are not a normal manifestation of allergy to angiographic dye. Even Dr. Bendersky admitted on cross examination that Salis's reaction to the 1977 catheterization may not have been allergic. Second, the patient had successfully undergone angiography on a number of previous occasions and nothing in the record indicates that the procedure was inappropriate as long as the proper steps were taken to remedy any side effects, such as chills. Lastly, the plaintiff has not demonstrated that the situation called for specific precautions other than Benadryl, even in light of the information in the New York records. After viewing the totality of the evidence, the court concludes that the VA physicians were not negligent in their approach to the allergy question.

A third area in which the plaintiffs question the care afforded Salis involves the treatment given in the days between the January 1978 angiogram and the transfer to Wilkes Barre General Hospital. Dr. Bendersky, for example, criticized the decision to prescribe potassium penicillin for the patient. He explained that this action created a danger of potassium poisoning, because Salis suffered renal failure during that period. The court, however, accepts the testimony of Dr. Aneja, *viz.*, while the danger of a potassium overdose required monitoring, the patient's particular situation rendered the penicillin injections appropriate.

The complainants' contentions concerning the alleged post-angiographic errors suffer from an additional defect. A litigant may not prevail on a malpractice theory unless he or she establishes a direct causal link between the physician's negligence and the harm suffered. *Jones v. Montefiore Hospital*, 431 A.2d 920, 923–24 (Pa.1981). *Hamil v. Bashline*, 481 Pa. 256, 264–66, 392 A.2d 1280 (1978).[5] In the present case, Salis's primary injuries clearly stemmed from the effects of the angiogram

---

4. From the testimony given in this trial, it appears that if the catheter is not inserted into a vessel with a good pulse the probe cannot pass through the aorta and obtain the desired x-rays of the distal circulatory system. The fact that Dr. Wendel did not remember many specifics about the angiogram is not surprising since he has performed thousands in his career. He conservatively estimated that he oversees an average of one a day. Dr. Wendel's testimony concerning his normal practice is relevant for evidentiary purposes. Fed.R.Evid. 406.

5. This requirement exists in all negligence cases. *See, e. g., Hunziker v. Scheidemantle*, 543 F.2d 489, 496 (3d Cir. 1976); *Whitner v. Lojeski*, 437 Pa. 448, 454–60, 263 A.2d 889 (1970); *Wisniewski v. Great American & Pacific Tea Company*, 226 Pa.Super. 574, 581–84, 323 A.2d 744 (1974). *See also* Prosser, *Law of Torts*, §§ 41–45 (1971).

itself, specifically, the shower of plaque in his left leg. To recover on the basis of negligence committed in the days after the procedure, the plaintiffs must demonstrate that during that period the patient was harmed in a compensable manner. Dr. Bendersky suggested that the potassium penicillin may have contributed to Salis's toxic condition at the time of the move to Wilkes-Barre General Hospital. If so, the problem was remedied by the dialysis and other measures taken at the latter institution. The complainants' have not proved any specific injury from the condition which would justify the recovery of damages. The same is true with regard to the other acts of negligence which the VA staff allegedly committed in the post-angiographic period.[6]

Finally, the court must decide the main negligence issue, i. e., whether the decision to subject Salis to the angiogram amounted to negligence. As previously explained, the plaintiffs argue that the risks incidental to the procedure so heavily outweighed the advantages that a reasonable physician would not have ordered the tests. The evidence presented at trial does not support this conclusion.

In January 1978, the patient suffered from intermittent claudication. In other words, the blood circulation in his extremities had decreased to the point that when he walked several blocks he felt pain in his right leg and the condition was only relieved by rest.[7] The testimony of the various physicians who appeared at the trial establishes two important facts about this disease. First, surgery is not the ordinary course of treatment for claudicants. In a large majority of cases, the condition will stabilize or improve with a program of "conservative" treatment, e. g., drugs, physical therapy.[8] Second, there are exceptions to the general rule. In such instances, the decision to undergo an operation to relieve the claudication is a highly personal one. The considerations to be weighed include: (1) the patient's life style, (2) the extent to which the disease has developed, (3) the inherent risks, and (4) the likelihood that the problems can be remedied through conservative methods. The appropriateness of surgery depends on the relative weight of these items.

In the instant case, the plaintiffs cannot prevail on a pure negligence theory. The court has found that the possibility of a serious complication from the angiogram ranged between one and two percent. The potential advantages were considerable since the test might have enabled the Government physicians to devise corrective surgery to restore the patient's mobility. Concededly, Dr. Bendersky opined that the dangers of the test completely outweighed any potential advantages. This conclusion rested on his opinion that the VA staff should not have considered surgery a valid option. Yet every other physician who testified with regard to the outlook for surgery believed that an operation might be appropriate if the angiogram yielded encouraging results. The law of Pennsylvania is clear that a doctor cannot be held liable for following a course of treatment

6. The plaintiffs assert that Salis has a diabetic condition which was untreated after the angiogram and for that reason, the sugar count in his blood rose to a very high level. During the trial, moreover, counsel for the complainants appeared to question the decision to wait four days after the angiogram before transferring the patient to Wilkes Barre General Hospital for dialysis. The record contains insufficient evidence on either of these points to permit a finding of negligence. Also, as in the case of the potassium issue, the plaintiffs have not proven that these alleged acts of misconduct caused Salis apparent mental disability, tangible mental distress, or any other injury that merits recovery.

7. Intermittent claudication is a form of arteriosclerosis, a disease with several degrees of severity. Rest pain, the next most serious stage, occurs when the patient experiences aches and soreness while relaxing. Finally, there is gangrene, the point at which all circulation ceases and the tissue of the affected area actually dies.

8. At the trial of the instant case, Dr. Lynch agreed with a scholarly article quoted by counsel which stated that sixty-six percent of claudicants were stabilized without surgery.

accepted by a substantial segment of the medical community. *Brannan v. Lankenau Hospital*, 490 Pa. at 597, 417 A.2d 196. The evidence before the court suggests that a significant percentage, indeed, probably a large majority, of qualified physicians would have viewed surgery to be one of the possible types of therapy to relieve Salis's intermittent claudication.

In the final analysis, the decision properly belonged to Salis. If, with knowledge of the possible consequences, he elected to undergo the test, then the VA physicians acted reasonably under the circumstances. Thus, the plaintiffs cannot attack the decision to employ angiography on any ground other than informed consent.

## IV. INFORMED CONSENT

The Pennsylvania case law concerning informed consent had its genesis in *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966). The plaintiff in that case entered Allegheny General Hospital for tests concerning his left leg, which had begun to atrophy. The patient signed a general consent form which permitted his attending physicians "to employ whatever operative procedure they deem[ed] necessary, using their best skill and judgment." The defendant performed the surgery that led to the litigation. The complainant thought that the operation was merely exploratory, and he believed that he would be consulted with regard to specific treatment once the physicians had completed their diagnosis. The defendant, however, did more than simply study the plaintiff's condition. Rather, he performed a laminectomy.[9] Unfortunately, the procedure was unsuccessful, and the patient became paralyzed from the waist down. The evidence did not establish that the surgeon had been negligent in carrying out the operation. The jury, however, returned an $80,000.00 verdict against the doctor on the ground that he had acted without the patient's consent. The trial court granted the defendant judgment notwithstanding the verdict, but the Pennsylvania Supreme Court reversed. *Id.* at 146–51, 223 A.2d 663.

Writing for the majority, Justice (now Chief Justice) O'Brien began with the proposition that consent to medical therapy is contractual in nature. According to this rationale, the physician and patient have an agreement concerning the scope and nature of the latter's care, and the doctor has no right to come into contact with the patient's body except within the terms of the compact. Thus, a surgeon who treats an individual without that person's consent commits a technical battery and is responsible for the consequences of the tort. *Id.* at 151–60, 223 A.2d 663. Furthermore, after reviewing scholarly comment and precedents from other jurisdictions, Justice O'Brien concluded that assent to treatment is not really conscious unless made with knowledge of the risks and possible benefits. On this basis, the majority ruled that consent is only valid if the individual grants it after being apprised of such important matters as the nature of the therapy, the seriousness of the situation, the disease and organs involved, and the potential results of the treatment. *Id.* at 160–66, 223 A.2d 663. After an examination of the record, Justice O'Brien declared that the issue of consent had been properly placed before the jury and the verdict should be allowed to stand. *Id.* at 166–67, 223 A.2d 663.[10]

---

**9.** A laminectomy involves surgical removal of one or more thin layers of the vertebrae, often including the spinous processes of the vertebrae. *Gould Medical Dictionary*, 838 (3d Ed. 1956).

**10.** One author has described the philosophical rationale of informed consent thusly:

The "Informed Consent Doctrine" has evolved from two basic principles of law. First, from equity, is the "fiduciary relationship"; that is, a relationship whereby a person occupies a position of trust and confidence, generally by reason of superior knowledge, to another, and becomes liable for any misrepresentations made, be they by nondisclosure or by an affirmative statement. Second, is the fundamental legal principle that people have the right to make major decisions about their bodies.

Victor, *Informed Consent*, 27 Med.Tr.Tech. Q. 138, 139 (1980). The *Gray* court provided that the burden of proof fell to the plaintiffs to establish lack of the appropriate consent. 423

In *Dunham v. Wright*, 423 F.2d 940, 944 (3d Cir. 1970), our Court of Appeals held that the logic of *Gray* not only obligates a physician to inform the patient of the risks inherent in a proposed course of treatment, but in many instances may require him to discuss alternate forms of therapy. The panel explained the reason for this conclusion is as follows:

> [T]he patient has the right and responsibility to determine whether he wants to risk the suggested corrective surgery. If a patient's decision is to be a knowing and intelligent one, he must understand in addition to the risks of the suggested surgery, the possible results of the failure to chance it. A complete understanding of the consequences of foregoing the operation would seem necessarily to include a consideration of the alternative treatment for the patient's disease or condition.

*Dunham v. Wright*, 423 F.2d at 944 (footnote omitted).

 The plaintiffs have invoked the *Gray-Dunham* rationale. They contend that the patient was never made aware of either the serious risks entailed in angiography or the other types of treatment that were available. On this basis, they argue that the patient did not give a valid consent to the procedure. In assessing this argument, the court must decide if the Salises have carried their burden of evidence on three crucial issues: (1) the responsibility of the VA staff to inform the patient of the relevant perils and options, (2) the failure of the physicians to perform that duty, and (3) causation between the failure to inform and the injury.

A. The Duty to Inform

 The recognized exceptions to the principle of informed consent fall into two primary groups. The first concerns situations in which the patient's medical condition renders discussion of the risks and benefits impossible or medically inadvisable. By way of illustration, the doctor may be excused from the obligations of the doctrine when the patient: (1) requires emergency care, (2) is incompetent, (3) waives the right to disclosure, or (4) may suffer emotionally from disclosure. Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance between Competing Values in Medical Decision Making*, 1979 Wis.L.Rev. 413, 431–70. *See also* Victor, *Informed Consent*, 27 Med.Tr.Tech.Q. 138, 142 (1980). The Government has never contended that any of these defenses apply to this case. A second category pertains to instances where the dangers are so remote that the physician has no duty to raise them. According to the defendant, this exception controls the instant litigation.

*Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647 (1971) recognized the remoteness argument raised by the United States. The case involved a plaintiff whose stomach was perforated during a gastroscopic examination.[11] The trial court instructed the jury to find for the defendants if the doctors in question had conformed to the "standard of disclosure exercised by a reasonable practitioner in his community." *Id.* at 265, 286 A.2d 647.[12] The jurors returned a defense verdict which the Pennsylvania Superior Court reversed. *Cooper* rejected the "community standard" for two reasons. First and foremost, the doctrine of informed consent exists for the benefit of the patients, and the court felt that the medical profession should not be permitted to determine its responsibilities to its own fiduciaries. Second, to prevail under a "community standard," a complainant would be required

Pa. at 155, 223 A.2d 663. Of course, there are exceptions to the *Gray-Dunham* principle which will be discussed in Part IV A, *infra*.

Pennsylvania has placed itself in a decided minority by choosing a "battery" rather than negligence theory in defining informed consent. This decision had drawn some criticism. *See Malloy v. Shanahan*, 421 A.2d 803, 805–08 (Pa. Super.1980) (Hoffman, J., dissenting).

11. Like an angiogram, this procedure is diagnostic.

12. This articulation of the duty to disclose represents the majority position among the states. For a good survey of the different viewpoints, see Annot., 88 A.L.R.3d 1008 (1978).

to present expert testimony concerning the normal level of disclosure in a given situation. The *Cooper* opinion feared that adoption of such a framework would encourage physicians to close ranks behind colleagues in a "community of silence" that would deny litigants the requisite evidence. Consequently, the Superior Court fashioned a different test for determining if the risks of a particular instance are sufficiently tangible to require disclosure. *Cooper* explained the proper formulation of the duty to disclose in these terms:

> A more equitable formulation would be: whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose every risk lest he be liable for battery. The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician.

*Id.* at 267–68, 286 A.2d 647 (emphasis in original). *Accord, Jeffries v. McCague*, 242 Pa.Super. 76, 84–85, 363 A.2d 1167 (1970); *Barshady v. Schlosser*, 226 Pa.Super. 260, 265, 313 A.2d 296 (1973) (Hoffman, J., in support of reversal with equally divided court).

A fair reading of *Cooper* and related precedents establishes two crucial facets of the remoteness defense to non-disclosure. Initially, resolution of the issue almost always turns on a question of fact. In *Cooper*, for instance, the stomach perforation had occurred against overwhelming odds. The procedure in question had been used for five years without any reports of such an injury. One of the defendants had performed 250 gastroscopic examinations flawlessly. Even more importantly, the procedure involved instruments generally considered safer than those used in a previous method where perforations had only occurred in .0004 percent of all tests. The Superior Court, nevertheless, remanded the case for a new jury trial. 220 Pa.Super. at 263, 286 A.2d 647.[13] In *Gray*, conversely, the Supreme Court still viewed the matter as a question of fact even when the risks were as high as fifteen to twenty percent. 423 Pa. at 163, 166–67, 223 A.2d 663. The present suit clearly falls within the parameters of *Cooper* and *Gray*. Second, the trier-of-fact must carefully examine the situation of a patient at the time of the treatment in order to determine what factors a reasonable person would have viewed important to a decision to accept or forego the therapy offered.

In the instant suit, the possibility of serious complications from the angiogram ranged between one and two percent. No witness claimed that this danger could be discounted as *de minimis*. On the contrary, both Drs. Wendel and Lynch agreed that a physician should have recognized the risks and taken proper precautions.[14] Furthermore, the circumstances in January 1978 were such that the patient should have had the benefit of disclosure.

---

**13.** In *Sauro v. Shea*, 257 Pa.Super. 87, 390 A.2d 259 (1978), the plaintiffs' daughter had died during an operation performed to remove twenty-three teeth. The Superior Court held that it was for the jury to decide if, under the *Cooper* test, the oral surgeon had a duty to inform the decedent of the "seriousness and potentially fatal complications inherent in the use of general anesthesia." *Id.* at 99, 390 A.2d 259. While the *Sauro* opinion does not give the percentage of risk in such matters, it can be assumed that they are small. *See also Dunham v. Wright,* 423 F.2d at 946 n.11 (chance of death resulting from operation set at "one percent").

**14.** These witnesses also testified that a patient contemplating an angiogram should normally be told about the perils. As noted in *Cooper*, this evidence cannot be used to establish a "community standard of disclosure." The court, however, does accept these assertions as probative of the fact that the risks were foreseeable to the VA staff.

Salis's condition called for a careful weighing of all factors for and against surgery. He had the time to make a reasoned decision. On one hand, his condition was relatively stable and the pain only occurred while walking. On the other, he experienced considerable discomfort and clearly desired relief. All told, the patient had three options open: (1) to risk the surgery and its incidental procedures, (2) to adjust his life style in light of the intermittent claudication, and (3) to continue pursuing conservative therapy. Each alternative had a separate set of dangers and potential benefits. In light of these possibilities, the attending physicians should have realized that a reasonable person in Salis's position would want to know of the collateral risks in angiography at this point in his life before he registered his final consent.

### B. Failure to Inform

The VA staff obtained the patient's signature on a standard consent form before Dr. Wendel administered the angiogram. The document, obviously drafted with an intention to protect the defendant in the event of litigation, contained the following statement:

> The nature and purpose of the operation or procedure, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure to be

See Plaintiff's Exhibit # 3 at M–83.[15] The Government has never maintained that this form, standing alone, satisfies the requirements of informed consent any more than the open-ended consent in *Gray v. Grunnagle*. Throughout this litigation, Salis has asserted that he was never warned of the dangers involved in angiography. Thus, the court is confronted with a question of credibility which it must resolve as trier-of-fact.[16]

The defendant cites three sources from which the patient supposedly obtained the information he deserved under *Gray* and *Dunham*. First, the Government notes that Dr. Cremone counseled Salis before the June 1977 angiogram. It is argued that this meeting fully covered the risks, benefits, and alternatives that were relevant to angiography. Defense counsel suggests that this consultation satisfied the requirements of informed consent with regard to the January 1978 procedure as well as that which occurred in June 1977.

The court does not deny that an individual's previous experience with a disease or treatment is relevant to the issue of informed consent. *See Sauro v. Shea*, 257 Pa.Super. at 99 n.3, 390 A.2d 259. Dr. Cremone's testimony, nevertheless, does not establish that the patient received an adequate briefing at the time in question. The physician did say, in a general way, that he discussed "the nature of the procedure, possible complications and risks, et cetera." Yet he did not give any specifics with regard to the type of warnings he gave or the alternatives mentioned. After comparing the statements of the physician and Salis, the court found that the June 1977 meeting

---

**15.** The blank was not completed.

**16.** In *DeFulvio v. Holst*, 272 Pa.Super. 221, 414 A.2d 1087, 1089 (1979) a physician and her former patient flatly contradicted each other's testimony on the nature of the explanation given before surgery. The Superior Court ruled that the matter amounted to a credibility issue and upheld the jury verdict against the doctor. *See also Harrigan v. United States*, 408 F.Supp. at 188–89 (credibility question resolved in favor of physicians).

Significantly, the defendant cannot foreclose this factual inquiry by establishing that the patient signed a form which states that the relevant risks were fully explained. The court must still decide if warnings were given and, in the event they were, whether they conformed to the requirements of *Gray* and *Dunham*. *Sauro v. Shea*, 257 Pa.Super. at 90–99, 390 A.2d 259; *Harrison v. Broadmarkel*, 127 Pittsburgh Leg.J. 151, 152 (Allegheny County Court of Common Pleas 1979). For a text suggesting consent forms of greater evidentiary value *see* Rosoff, *Informed Consent* at 281–309 (1981).

did not serve to satisfy the mandates of informed consent.[17]

Second, defense counsel contends that the patient received the requisite briefing at separate meetings with Drs. Cremone, Kaplan, and Wendel before the January 1978 angiogram. The court disagrees. Once more, Dr. Cremone's testimony is too sparse to convince the court that the requisite dangers and options were reviewed.[18] Dr. Kaplan's assertions also fail to demonstrate the requisite warnings. At first, his description of the pre-angiographic discussions indicated that the patient only learned about the danger of a hematoma.[19] After further questioning by defense counsel, the witness said that the staff briefed Salis on the possible need for corrective surgery after the procedure if a serious clot developed. The court finds that this testimony does not demonstrate compliance with the doctrine of informed consent. Dr. Kaplan's memory concerning the details of the counseling session was not as reliable as Salis's. In his pretrial deposition, for example, the physician said that when he originally discussed the risks involved in the angiogram he told the patient that the underlying problem was rest pain, not intermittent claudication. The surgeon's deposition, moreover, did not mention any admonition concerning the possibility of clots from the procedure.[20] Furthermore, Dr. Kaplan's testimony at trial made no reference to a discussion of alternatives. After hearing both the physician and the patient, the court decides that

the issue of recollection must be resolved in favor of the latter.[21] Lastly, Dr. Wendel explained that as a radiologist he merely informed the patient of the mechanics involved in angiography.[22]

The Government's final argument reasons that Salis received notice of the risks posed by the tests from his previous experience with the procedure, especially the embolectomy he received following cardiac catheterization in New York during the 1974 hospitalization. In *Sauro v. Shea*, the defendants, oral surgeons, attempted to employ this type of argument. The plaintiff's daughter died following an operation to extract twenty-three teeth. On appeal, the Pennsylvania Superior Court reviewed the evidence of informed consent. The defendants contended that the decedent knew the dangers of general anesthesia because she had undergone several surgical extractions in the past. The majority found this proposition unpersuasive. The *Sauro* opinion noted that the scope of the fatal operation, *i. e.*, twenty-three extractions, was much greater than the earlier procedures. Even more importantly, the defendants "offered no testimony regarding any specific information they had given the decedent in connection with past extractions." 257 Pa.Super. at 99 n.3, 390 A.2d 259. Accordingly, the majority ruled that the previous operations did not provide adequate notice under the precepts of informed consent. *Id.*

In the instant case, the Government's theory concerning Salis's prior experience

---

**17.** See Document 37 of the Record at 113–14. A physician who claims that the patient received sufficient disclosure to satisfy the doctrine of informed consent must supply adequate detail to support that assertion. As already explained, the *Gray-Dunham* holdings not only require warnings of possible dangers but also discussion of alternative treatments. If a physician does not specify the type of warnings and alternatives disclosed, the court has no way to determine if an informed consent was obtained. Overall, it must be concluded that the Salises have carried their burden of proof on this issue.

**18.** *See* Document 37 of the Record at 134–35.

**19.** *See* Document 38 of the Record at 150–51. A hematoma, a localized collection of blood is not a serious complication. Dr. Wendel testi-

fied that one usually occurs in every ten to fifteen angiograms.

**20.** *See* Document 38 of the Record at 78–86.

**21.** It is by no means implied that Dr. Kaplan, or any of the other physicians who testified in this suit, consciously withheld the truth. Whether or not the requirements of informed consent have been followed in a particular situation is a legal determination based on specific findings of fact. The court simply holds that Mr. Salis's testimony was reliable and that the Government's contrary evidence did not satisfactorily rebut his statements concerning the lack of informed consent.

**22.** *See* Document 38 of the Record at 139–41.

must fail on similar grounds. The second angiogram performed in 1974 was not only removed in time but also different in scope. The earlier procedure involved catheterization in the area of the heart. The 1978 test, conversely, implicated the vessels of the left leg. Nothing in the record establishes that the patient should have assumed that the perils he faced in the two situations were essentially identical. As in *Sauro*, moreover, the defendant has not shown that the physicians informed Salis of "specific information" before the earlier procedure that can be characterized as compliance with informed consent. Finally, the only thing that the patient certainly learned from the embolectomy was that chills and a minor clot could occur. The 1974 mishap did not inform him of the likelihood of either a major plaque shower or danger from other sources, e. g., reaction to the iodine in the dye. More significantly, the previous experience did not apprise Salis of the alternatives to surgery and angiography that he had in 1978. In short, the fact that the patient had once suffered an embolism after catheterization does not suffice by itself to discharge the dictates of *Gray, Dunham,* and their progeny.[23]

C. Causation

In *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), the Court of Appeals for the District of Columbia Circuit issued a watershed opinion on the issue of informed consent. For the purposes of the present litigation, the precedent is most important for its discussion of causation. On behalf of the unanimous panel, Judge (now Chief Judge) Robinson explained that a plaintiff should not prevail merely because the defendant breached the duty to obtain an informed consent. On the contrary, the court concluded that a "causal relationship" must exist between the physician's failure to disclose and the complainant's agreement to undergo the procedure which gave rise to the injury. As Judge Robinson observed, "[T]he patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of the perils." *Id.* at 790. Consequently, *Canterbury* held that to recover under the theory of informed consent, the complainant must prove that "a prudent person in the patient's position" would not have assented to the treatment "if suitably informed." *Id.* at 791.[24] Several Pennsylvania decisions have adopted this rule. *Bowers v. Garfield,* 382 F.Supp. 503, 505–06 (E.D.Pa.1974), aff'd, 503 F.2d 1398 (3d Cir. 1974); *Jeffries v. McCague,* 242 Pa.Super. at 84, 363 A.2d 1167. *See also Harrigan v. United States,* 408 F.Supp. at 187–88. Many other states

**23.** Of course, the three sources of notice cited by the Government must be viewed in their totality as well as individually. Under the appropriate circumstances, an inadequate disclosure could be supplemented by the patient's past experience, or some other type of information, to the extent that the requirements of informed consent are met. In this case, however, the court finds that the discussions between Salis and his physician did not constitute enough of a disclosure to satisfy *Gray* and *Dunham* even when considered with all of the other sources of notice at the patient's disposal.

**24.** The Court of Appeals noted that it could have devised a "subjective" standard of causation, i. e., whether the plaintiff in question would have opted for the treatment if informed. Judge Robinson concluded that such a formulation would entangle the judiciary in an inordinately difficult fact-finding process involving hindsight and recriminations. Hence, the panel selected an "objective" test. *Canterbury v.*

*Spence,* 464 F.2d at 790–91. *See Henderson v. Milobsky,* 595 F.2d 654, 658 n.26 (D.C.Cir. 1978). Yet *Canterbury* did not hold that the trier-of-fact may ignore the patient's testimony as to what he would have decided if given full disclosure. Judge Robinson explained that the plaintiff's input is a relevant consideration in deciding how a "prudent person" would have reacted. 464 F.2d at 791. Salis testified that he would not have undergone the operation if apprised of the potential consequences. This court finds his assertion reliable.

The *Canterbury* panel held that the burden of proof on all elements of the basic cause of action properly accrues to the plaintiff. 464 F.2d at 791. Judge Robinson, however, did note a general exception to this principle. The defendant bears both the burden of going forward and the burden of persuasion on any assertions of privilege against disclosure. *Id.*

have accepted the causation standard. *See, e. g., Revord v. Russell*, 401 N.E.2d 763, 767 (Ind.App.1980); *Scott v. Bradford*, 606 P.2d 554, 558 (Okl.1980); *Goedecke v. State Department of Institutions*, 198 Colo. 407, 603 P.2d 123, 125 (1979). *See also Macey v. James*, 427 A.2d 803, 804 (Vt.1981) (applying New Hampshire law).

Unfortunately, the Pennsylvania authorities which have recognized the *Canterbury* rationale all involved situations factually different from the case at bar. None of these precedents provides specific guidance for applying the "objective causation" test in Salis's situation. Nonetheless, decisions from other jurisdictions demonstrate that the complainants have sustained their burden of proof.

Implementation of the *Canterbury* analysis must begin with a careful review of the particular circumstances at issue. *Dewes v. Indian Health Service*, 504 F.Supp. 203 (D.S.D.1980), for instance, arose from surgery that followed a motorcycle accident. The physician performed an "open reduction" on the patient's right wrist in order to relieve a developing circulation problem. As a result of the operation, the plaintiff lost most of the mobility in his entire arm and the limb required further surgery. Applying South Dakota law, the district court ruled the doctor breached his responsibility under the informed consent principle. The *Dewes* opinion then applied the *Canterbury* causation analysis. The court found that the complainant could have been treated with other forms of therapy, both surgical and non-surgical, which offered a chance for recovery without the permanent physical impairment incidental to "open reduction." *Dewes* held that the dangers of the treatment so greatly outweighed the potential benefits that a "prudent person" in the plaintiff's position after the accident would have foregone the operation if fully informed of the consequences and alternatives. *Id.* at 206–08.

The United States District Court for the Eastern District of Virginia found an absence of causation in *Dessi v. United States*, 489 F.Supp. 722 (E.D.Va.1980). In that litigation, a physician employed by the Public Health Service performed a transurethral resection to remove an obstruction from the plaintiff's prostate. The operation unfortunately caused impotence and the former patient sued on the ground that he had not made an informed consent. The court agreed that the doctor had not fulfilled his duty under the doctrine but found for the defendant on the causation issue. According to the *Dessi* opinion, the objective risk of impotence had been slight. Furthermore, at the time of the surgery the plaintiff's prostate was rapidly degenerating and the transurethral resection offered a sound course of therapy. In light of these facts, the district court held that the "prudent person" described in *Canterbury* would have elected the treatment. 489 F.Supp. at 728–30.[25]

Read together, *Dewes* and *Dessi* establish three primary factors that the trier-of-fact must examine to determine if causation exists. At the outset, the court must look to the *degree of risk* actually involved in the relevant procedure. The percentage of peril must be compared to the *likelihood of benefit* from the therapy and the *type of alternatives* that present themselves. In the present litigation, review of these considerations favors the Salises.

As already noted, the angiogram entailed an inherent risk of one to two percent. This figure places the case between the extremes of *Dewes* and *Dessi*, where the respective percentages appear to have been one hundred percent and miniscule.[26] The

---

**25.** *See also Revord v. Russell*, where the plaintiffs' daughter had died during an operation to remove a brain tumor. The Indiana Court of Appeals rejected the complainants' informed consent theory, in part because they presented no evidence of an alternative course of action that they could have taken if warned of the dangers collateral the surgery. 401 N.E.2d at 767.

**26.** In *Dewes*, the opinion indicates that the physical disability suffered by the plaintiff was a natural side-effect of "open reduction." The *Dessi* court, conversely, ruled the risk of impo-

second factor, however, is stronger for the plaintiff than the situations in either of the two precedents discussed above. *Dewes* and *Dessi* both involved therapeutic procedures with high rates of success. Yet Salis underwent a diagnostic test, and there was no way to calculate the likelihood that the results would eventually lead to relief.[27] Thus, the percentages for "success" were unknown.

Finally, the court must turn to the other options the patient had in January 1978. As explained at the outset, angiography is a diagnostic test which is only appropriate when surgery is under consideration. Thus, the primary alternative would have been a course of "conservative" therapy to handle the problem without surgery. Such treatment would have mainly consisted of drugs, known as vasodilators, administered to relieve the symptoms of claudication. Significantly, "conservative therapy" could have been implemented without the use of angiography and its inherent risks. The defense contends that the VA staff attempted to remedy the matter with medication and that Salis received regular dosages of Arlidin between June 1977 and the angiogram. This contention is bolstered by records which note that the drug was prescribed for use during the period. On this basis, it is contended that the conservative approach had failed and, for that reason, did not present an alternative to surgery. The patient, conversely, insists that the drug was not prescribed. Resolution of this issue does not impeach the good faith of either side.

Dr. Kaplan testified that more work has to be done at VA Hospitals to educate patients about proper health habits when they return home. He described the matter thusly:

> Now, in the V.A. we have a problem because although we have created and implemented a system of education of patients, done mainly by the nurses, we have made a movie for that purpose too, which is being shown elsewhere too, the problem is that we do have a reluctance to follow the indications of the physician. They fall by the wayside.
>
> Sometimes—well, it happened with the plaintiff, he didn't know that he was receiving the medicine. For all I know, he probably didn't take it. I don't know.

*See* Document 38 of the Record at 112–13. Thus, Dr. Kaplan believed it quite possible that the patient did not realize that the Arlidin had been prescribed and was to be taken. As previously noted, the court found Salis's testimony reliable. Consequently, in light of Dr. Kaplan's description of a possible innocent breakdown in communications, the patient's assertion that he never took the Arlidin is accepted.[28]

The court concludes that a reasonable person in Salis's position "suitably informed" of the risks inherent in angiography would not have undergone the procedure in January 1978. The test was not necessary until surgery became an appropriate consideration.[29] The patient, moreover, had access to several types of conservative therapy,[30] and his condition would appear to suggest a cautious approach. Although he experienced pain and desired

---

tence so slight that a percentage was not even calculated.

27. Salis still suffers from intermittent claudication in his right leg. The record does not indicate if the condition could be remedied with surgery.

28. The court also finds that if the VA physicians had discussed the risks and alternatives necessary under *Gray* and *Dunham*, they would have mentioned the Arlidin prescription and learned that Salis had not undergone conservative treatment.

29. All of the physicians who testified agreed that nonoperative therapy should be tried for at least six months before surgery is employed. Dr. Kaplan was the most pessimistic concerning the prospects of success through such therapy. Yet even he did not dispute the thesis clearly accepted by Dr. Lynch, that surgery should only be tried if other therapy failed.

30. Dr. Cremone stated that the use of Arlidin would not have exhausted all "conservative" options, because other vasodilators could have been used, *e. g.*, Vasodiolan. *See* Document 37 of the Record at 118.

treatment, his situation was relatively stable. Furthermore, increased mobility was not critical to his livelihood, since he was retired. Nothing in the record suggests that he would have desired prompt surgery if apprised of the potential perils and options. On the contrary, an examination of the risks, likelihood of success, and alternatives to surgery convinces the court that a fully informed "prudent person" confronted with Salis's choices in January 1978 would not have considered the dangers of surgery and its preliminary procedures, e. g., angiography, until the safer "conservative" strategy had been fairly exhausted.

## V. DAMAGES

 The evidence does not justify recovery on behalf of Alice Salis. She did not testify at the trial concerning any loss of consortium or other consequences arising from her husband's injuries. Her son merely stated that she has become "more nervous" since her husband's amputation. Standing alone, this fact does not justify damages because of mental distress or any other loss. The situation with regard to William Salis, however, is quite different.

 The former patient has not suffered out-of-pocket medical expenses, since he was retired at the time of treatment and has received payment for all medical expenses from the VA. Nonetheless, the results of the angiogram have caused him considerable pain, suffering, inconvenience, and impairment of life style. He had to engage in an arduous program of physical therapy to adjust to his prosthesis, and he experienced periods of discouragement in the process. He must use crutches to move about and, for the most part, he is now confined to his home. Concededly, Salis suffered from several serious health problems prior to January 1978, and it is difficult to identify and evaluate the amount of increased pain, suffering, inconvenience and mental distress caused by the unfortunate plaque shower in the Wilkes-Barre VA Hospital. Prior to the amputation, his movement was limited to short walks and he required periodic rest from his leg pain.

Because of his heart condition he couldn't perform household tasks such as mowing the lawn. His lifestyle had already been significantly compromised. He admits having a very good recovery from his amputation. Yet the fact remains that the former patient has sustained additional injury and deserves appropriate compensation.

At the time of trial, a person of Salis's age had an average life expectancy of nineteen years. Although there was brief commentary on the impact of plaintiff's medical condition on his life expectancy, it was not sufficient to persuade me to conclude that his life span would be less than the national norm. In all, Salis should be compensated for a period of twenty-one years and eight months, which includes his life expectancy at the time of trial and the two-year and eight-month period between the January 1978 angiogram and the beginning of the trial. The court finds that he should receive $25,000 for the first postoperative year and $7,000.00 for each subsequent year in this time frame. Accordingly, Salis will be awarded $169,700.00.

## VI. CONCLUSION

The consequences of this case were tragic for Salis, his family, and the attending physicians. The court wishes to emphasize that it found no negligence on the part of the doctors who cared for the patient. Yet the communications between Mr. Salis and the VA staff reveal a serious lack of informed consent under the law of Pennsylvania and, consequently, the former patient is entitled to recover damages.