Donald J. MacDONALD, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 3:CV–88–1567.

United States District Court,
M.D. Pennsylvania.

June 28, 1991.

Lewis H. Markowitz, York, Pa., for plaintiff.

Jerome T. Dempsey, Office of Dist. Counsel, Philadelphia, Pa., Robert J. De-Sousa, U.S. Attorney's Office, Scranton, Pa., for defendant.

## MEMORANDUM

McCLURE, District Judge.

### I. *Background:*

This is an action arising under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (the "FTCA"), and this court has jurisdiction under the provisions of 28 U.S.C. § 1346(b).

Plaintiffs, Donald J. MacDonald and Mary G. MacDonald, his wife, filed a three-count complaint against the United States of America acting through its agency, the Veterans Administration Medical Center at Wilkes–Barre, Pennsylvania (the "VA Medical Center" or "USVAH–WB"). At the VA Medical Center on or about April 2, 1986 plaintiff Donald J. MacDonald underwent surgery known as a superficial femoral-anterior tibial reversed saphenous vein reconstruction on his left leg. Plaintiff Donald J. MacDonald claimed that this operation resulted in extreme exacerbation of existing chronic venous insufficiency and has left him incapacitated.

Count I of the complaint alleges that the VA Medical Center deviated from the standard approved surgical practice by failing to have available and to consult plaintiffs'

prior medical records, as well as failing to perform indicated tests and ignoring or failing to recognize signs and symptoms contraindicating surgery, thereby performing unnecessary, unwarranted and harmful surgery and being otherwise negligent. In Count II MacDonald alleges that he did not give his informed consent to the surgery. In Count III plaintiff Mary G. MacDonald asserted a derivative claim for loss of support, consortium and services. The court has previously dismissed Count III and the veteran, Donald J. MacDonald, remains as sole party plaintiff and will be hereinafter referred to as "MacDonald". As MacDonald was not entitled to a jury trial, 28 U.S.C. § 2402, the court proceeded with a bench trial, bifurcating the issues of liability and damages. This memorandum pertains solely to the liability phase of the case.

### II. *Motion to Strike Expert Testimony*

At trial, plaintiff moved to strike the testimony of Drs. Thiele and Comerota. He claimed that the United States violated the discovery rules in presenting its expert testimony. In addition, he has argued that the United States violated the public policy of the Commonwealth of Pennsylvania by conducting ex parte interviews with plaintiff's treating physician, Dr. Thiele, and, therefore his entire testimony should be stricken.

#### A. Rule 26(b)(4)

■ In response to discovery requests a party is required to supply the requesting party with the identity of expert witnesses and the subject-matter and substance of their testimony.[1] Fed.R.Civ.P. 26(b)(4)(A)(i). Plaintiff maintains that the United States failed to comply with this rule by: 1) listing Dr. Thiele as a fact witness, rather than an expert, and 2) eliciting expert testimony from Dr. Comerota relating to liability, standard of care and causation after indicating that his testimony was limited to his examination of plain-

---

1. A party is under a continuing duty to supplement his responses to these discovery requests whenever necessary. Fed.R.Civ.P. 26(e)(1)(B).

tiff on April 19, 1989 and his diagnosis of chronic compartment syndrome. Assuming, arguendo, that this is true, standing alone, it would not justify the exclusion of this expert testimony.[2]

There are four factors which the court must consider in determining whether to exclude expert testimony for a failure to comply with pre-trial notice requirements: 1) the prejudice or surprise in fact of the party against whom the witness would testify; 2) the ability of that party to cure the prejudice; 3) the extent to which allowing the witness to testify would disrupt the orderly and efficient trial of the case; and 4) bad faith or willfulness in failing to comply with the pre-trial notice procedures. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201–02 (3d Cir.1978). Any claim by the plaintiff that he was surprised by the testimony of Drs. Comerota and Thiele is unjustified. Regardless of the substance of their testimony, the United States did notify the plaintiff that the doctors would, in fact, be testifying. Moreover, the testimony of Drs. Comerota and Thiele was virtually identical to that of the United States' other experts, Drs. Larkin and Roberts. It is difficult to conceive of any prejudice suffered by plaintiff which would justify striking the testimony of these witnesses. See *Go–Tane Service Stations v. Clark Oil & Refining*, 798 F.2d 481, 491 (Em.App.1986) *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986); *Stich v. United States*, 730 F.2d 115 (3d Cir.1984) *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984).

### B. Public Policy

Plaintiff contends that the United States violated the public policy of the Commonwealth of Pennsylvania by conducting ex parte interviews with Dr. Thiele, plaintiff's treating physician.[3] This contention is based largely on *Manion v. N.P.W. Medical Center*, 676 F.Supp. 585 (M.D.Pa. 1987).

In *Manion* the plaintiff's former treating physicians refused to speak to plaintiff's counsel after engaging in ex parte discussions with defense counsel and agreeing to testify as expert witnesses for the defense. Subsequently, the court held that the defense was precluded from future ex parte contacts with any of the plaintiff's former or current treating physicians unless advance reasonable notice was provided to

---

**2.** Plaintiff's contention that the United States failed to comply with Rule 26 with respect to Dr. Comerota is thwarted by the United States' Second Set of Supplemental Answers to Plaintiff's First Set of Interrogatories which clearly state that "Dr. Comerota has been hired to testify as to ... his opinion of the success of the operation as well as the cause of MacDonald's current problem."

Moreover, Rule 26(b)(4) requires a party to reveal only "facts known and opinions held by experts ... acquired or developed in anticipation of litigation." The Notes of the Advisory Committee on Rule 26(b)(4) state:

It should be noted that this subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

Dr. Comerota serves as a consultant to the Veteran's Administration Hospital and examined MacDonald at the request of Dr. DeRojas in order to determine the basis for his ongoing symptoms and to recommend a proposed treatment. MacDonald's family physician, Dr. Arta-

bane, referred him to Dr. Thiele for examination and treatment of his leg problems. While it is unquestionable that some of the facts known and opinions held by Drs. Comerota and Thiele were formed after they were retained as experts, clearly, their testimony was almost entirely based on their examinations of Mr. Mac-Donald which were not performed in preparation for litigation. See *Baran v. Presbyterian University Hospital*, 102 F.R.D. 272 (W.D.Pa. 1984); *Nelco Corp. v. Slater Electric Co.*, 80 F.R.D. 411 (E.D.N.Y.1978).

**3.** Because this is an action under the FTCA, the state law that would apply to determine the liability of "a private individual under like circumstances" applies to determine the liability of the government. 28 U.S.C. § 2674; see *Rodriguez v. United States*, 823 F.2d 735, 739 (3d Cir.1987). The Commonwealth of Pennsylvania supplies the applicable law in this case. In addition, Federal Rule of Evidence 501 requires federal courts to determine issues of privilege in accordance with the law of the state that supplies the rule of decision. See *Slakan v. Porter*, 737 F.2d 368, 377 (4th Cir.1984) *cert. denied, sub nom, Reed v. Slakan*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

plaintiff or his counsel.[4] The court based this decision on what it opined to be the public policy of the Commonwealth of Pennsylvania of protecting the confidential nature of the physician-patient relationship and preserving the physician's fiduciary responsibilities during the litigation process.

In reality, there is no such clear-cut public policy in this state.[5] In *Holtzman v. Zimmerman*, 47 Pa.D. & C.3d 608 (1988), Judge Bayley rejected the notion of a public policy prohibiting ex parte discussions with treating physicians.[6] After considering all of the case law, including *Manion*, Judge Bayley determined that Pennsylvania's statutory protection of the physician-patient relationship, from which this public policy was derived, is severely circumscribed.[7] See *Feingold v. SEPTA*, 512 Pa. 567, 517 A.2d 1270 (1986); *Commonwealth ex rel. Platt v. Platt*, 266 Pa.Super. 276, 404 A.2d 410 (1979); *In re "B"*, 482 Pa. 471, 394 A.2d 419 (1978). Judge Bayley also examined statutes which provide broad protection for confidential communications, i.e. attorney-client and psychologist-patient, and noted that the legislature was perfectly capable of providing a broad physician-patient privilege if it so desired.

After an exhaustive analysis of the relevant law, Judge Bayley held:

In that unique situation such as *Manion* where the prior treating physicians would not even discuss the case with plaintiff's attorney, plaintiff's attorney is allowed to conduct depositions and can always call the physician as a fact witness. The remedy provided in *Manion* was not necessary or supported by Pennsylvania law. Ultimately, the credibility of any witness, a physician included, is to be determined by the trier of fact. The knowledge these physicians may have, or the interest they may have in the outcome of a case, or any animosity they may have toward their former patients may all be considered in the credibility to be attributed to their testimony.

*Holtzman v. Zimmerman*, supra, at 628.

Furthermore, in *Moses v. McWilliams*, 379 Pa.Super. 150, 549 A.2d 950 (1988) (en banc), *allocatur denied*, 521 Pa. 630, 558 A.2d 532 (1989), the Superior Court refused to recognize a cause of action against plaintiff's treating physician for defamation and breach of confidentiality resulting from the physician's participation in ex parte conferences in connection with a prior malpractice suit filed by the plaintiff. The *Moses* majority opinion of Judge Montemuro provides extensive commentary and analysis of the Pennsylvania physician-patient privilege and how it applies when the patient files a personal injury claim.

In denying plaintiff's claim, the court in *Moses* recognized that it had to leave "reasonably unobstructed the paths which lead to the ascertainment of truth" and to "encourage witnesses with knowledge of facts

---

**4.** The type of overreaching exhibited by the defense counsel in *Manion* does not exist in this case. The Assistant United States Attorney's ex parte contact amounted to a telephone call to determine Dr. Thiele's availability to testify and a review of the facts before his deposition on October 4, 1990 during which he explained his opinions as to the cause of MacDonald's pain and the propriety of the operation.

   Although plaintiff contends that the Assistant United States Attorney persuaded Dr. Thiele to testify as an expert witness against his own patient prior to the submission of the United States' pre-trial memorandum, which indicated that Dr. Thiele was to testify as a fact witness only, and knowingly concealed this fact from the plaintiff, there is simply no evidence to support this assertion.

**5.** No Pennsylvania appellate court has ever held that such a public policy exists and the decision in *Manion* was based in large part on general statements of Pennsylvania trial courts for which there was no precedent.

**6.** This court notes that *Holtzman* dealt with ex parte contact with a former treating physician, while Dr. Thiele is a current treating physician. However, this is not relevant for a determination of the instant issue because the plaintiff waived his privilege of confidentiality when he instituted this action.

**7.** 42 Pa.C.S.A. § 5929 sets forth the physician-patient privilege: "No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries."

relevant to judicial proceedings to give complete unintimidated testimony". *Id.* at 164, 549 A.2d at 957 (citations omitted). The court also noted that ex parte interviews are "conducive to candor and spontaneity", less costly, easier to schedule than depositions and cost-effective methods of eliminating non-essential witnesses in a case where a plaintiff may have a number of treating physicians. *Id.* at 167–68, 549 A.2d at 959.

However, by permitting ex parte interviews with treating physicians, the Superior Court did not intend to open the door to any and every disclosure by a physician concerning his patient's medical condition. The opinion specifically notes that the disclosures should be limited to that which is pertinent and material to the underlying action. *Id.* at 169, 549 A.2d at 959. Plaintiff makes much of the fact that the physician in *Moses* was prohibited from testifying as an expert in the malpractice action. The trial judge ruled that he could testify only as a fact witness. However, the physician in *Moses* was the subject of numerous ex parte interviews and continued to meet with defense counsel despite an injunction. In the instant matter, defense counsel's ex parte contact was minimal and does not justify precluding Dr. Thiele from testifying as an expert.

Based on the analysis of Pennsylvania doctor-patient privilege contained in *Holtzman* and *Moses*, this court, with all due respect, rejects the notion of a public policy in Pennsylvania prohibiting ex parte contact with treating physicians, as set forth in *Manion.*

Accordingly, plaintiff's motion to strike will be denied.

### III. *Findings of fact:*

The court heard five days of testimony and watched videotaped depositions of two expert medical witnesses. In addition to his own testimony, MacDonald presented nine lay witnesses. His family physician and the operating surgeon (as on cross-examination) both testified as fact and expert witnesses, and a vascular surgeon testified as an expert witness. In addition, transcripts of the depositions of Drs. Sicilia and Cesar, surgical residents serving a rotation at the VA Medical Center, were presented on behalf of plaintiff. Defendant presented the testimony of four vascular surgeons, two of whom had examined MacDonald.

On the basis of all the evidence presented, and the Agreed Statement of Undisputed Facts (134 paragraphs), the court makes the following findings of fact comprised in the most part by significant portions of MacDonald's very extensive medical history. (Additional findings of fact pertaining primarily to the issue of informed consent are set forth in narrative form in the discussion portion of this memorandum.)

### A. General.

1. MacDonald resides with his wife, Mary G. MacDonald, at 1718 Penn Avenue, Scranton, Lackawanna County, Pennsylvania, within the Middle District of Pennsylvania.

2. Defendant United States of America operates a health care facility known as The Veterans Administration Medical Center at Wilkes–Barre, Luzerne County, Pennsylvania, also within the Middle District of Pennsylvania.

3. MacDonald was born May 16, 1939, and is a lifelong resident of Scranton, Pennsylvania.

4. MacDonald was graduated from Eastern Kentucky University where he was a member of the United States Army ROTC and from which he obtained a bachelor of arts degree and a teacher's certificate in health and physical education.

5. MacDonald was an outstanding athlete in high school, preparatory school and college.

6. MacDonald entered the United States Army as a Second Lieutenant in January 1964 and volunteered for combat duty in Vietnam in January of 1967.

7. MacDonald completed substantial studies toward a master's degree in education while in the United States Army.

8. MacDonald taught military science while in the United States Army at Georgetown University.

9. While in Vietnam in March 1967, as an infantry battalion advisor to the Republic of Vietnam's Army, he was seriously wounded in the legs.

10. In 1969 MacDonald was honorably discharged from the armed services and returned to Scranton where he immediately became employed with Emery Worldwide, initially as a supervisor of the mail room and then about one year later was reassigned to the credit department, which he eventually took over as manager in the early 1970's. Not happy at Emery, he took employment as a letter carrier with the United States Postal Service in July 1984.

11. In January 1986 MacDonald, having experienced considerable pain in his lower left calf while walking his route, went to the VA Medical Center. He was found to have an arterial occlusion or blockage in his lower left extremity, and consequently on or about April 2, 1986, underwent surgery at the VA Medical Center to correct the occlusion. Dr. Juan DeRojas, a surgeon with the United States Veterans Administration, performed a superficial femoral-anterior tibial reversed saphenous vein reconstruction on MacDonald's left leg.

12. The arterial surgery was successful, in that it restored normal blood flow to the lower left extremity.

13. Post-operatively MacDonald experienced great swelling in his left leg with subsequent skin breakdown. He never returned to his employment and although the swelling and dermatitis came under control by virtue of frequent periods of elevation of the leg above the heart, MacDonald has continued to experience pain in his left leg which has become progressively more severe and continues to be disabling.

14. At all times material to this action, all persons, physicians, nurses or technicians who treated or examined, tested or cared for MacDonald at the USVAH were employees or agents of the defendant, United States of America, and were acting within the scope and course of their employment or agency.

B. Medical History—Pre–Operative.

15. On March 4, 1967, in Vietnam, MacDonald suffered multiple fragment wounds in both legs, the back, and left elbow.

16. On March 4, 1967, a physical exam was performed at the 67th Evac Hospital which revealed multiple fragment wounds of both legs with pulses intact in both feet (Dorsalis Pedalis). No neurological deficit was noted except a complaint of numbness in the little toe of the left foot.

17. On March 4, 1967, an operation was performed under general anesthesia which consisted of debridement of multiple fragment wounds of both legs, with a post-operative complaint of numbness of the little toe of the left foot.

18. On March 4, 1967, an x-ray was performed at the 67th Evacuation Hospital which showed exostosis (a benign growth projecting from a bone surface characteristically capped by cartilage) at the proximal tibias and left distal femur.

19. Upon return from the recovery room, the color and sensation in both feet were satisfactory.

20. Upon his discharge from the 67th Evac Hospital, MacDonald was observed to have had no neurovascular injury to his legs except some numbness in his little left toe.

21. On March 6, 1967, MacDonald was transferred to Tripler Army General Hospital, Honolulu, Hawaii, where he was hospitalized for 35 days and was discharged on April 7, 1967.

22. On his admission exam at Tripler Army General Hospital (TGH) it was determined that soft tissue wounds were confined to the lower extremities and that MacDonald had no fever, chills or other complications since his injury.

23. The admitting diagnosis at TGH was multiple fragment wounds of both legs with distal superficial peroneal nerve injury, which was manifested by a decreased sensation over the 1st and 2nd toes of the left foot and anterior part of ankle.

24. On March 10, 1967, a debridement of the left leg with a closure of wounds was performed on MacDonald at TGH. On inspection it was found that there were two wounds of the left leg. There was a wound over the lateral (side) aspect of the leg which was down through the fascia (a band or sheet of tissue connecting muscles) of the anterior (toward the front) compartment. The fascia of the anterior compartment was opened and run up the subcutaneous aspect of the leg, opening it from approximately 2 " below the fibular head to the ankle and then closing it.

25. There was a small second wound over the anterior (toward the front) aspect of the distal (remote) fibia.

26. Upon his return to the ward from the recovery room, MacDonald had full sensory and motor return in his left leg.

27. When he was discharged from TGH, there was an area of hypesthesia (a state of abnormally decreased sensitivity to stimuli) on the lateral (side) and dorsal (directed toward or situated on the back) aspects of the left foot which was attributed to the superficial peroneal nerve injury.

28. When he was discharged from TGH, MacDonald had weakness of dorsiflexion of the left ankle, eversion of the left foot and eversion and flexion of the toes of the left foot. There was no evidence of inflammation of the soft tissue of the left leg so that his treating physician concluded that the range of motion was related to muscle discomfort.

29. The final diagnosis at discharge from TGH was wounds, multiple fragments, posterior (directed toward or situated at the back) aspect of trunk and lower extremities with left superficial peroneal nerve injury.

30. On April 24, 1967, MacDonald was admitted to Valley Forge General Hospital (VFGH) in Pennsylvania, where his wounds were found to be healed.

31. On admission to VFGH, it was noted that MacDonald had numbness over dorsum (the back) and lateral (side) aspect of left foot from distal (remote) healing scar.

32. On admission exam, MacDonald had a positive Tinel's sign from the fibula head with conduction of the toes. There was no decrease in sensation on the plantar surface. He had sensation to pressure over the numb area.

33. On April 25, 1967, an EMG study was performed on MacDonald which showed some deficiency of the posterior tibial nerve distribution on the left leg, which was observed to be returning.

34. MacDonald's course at VFGH was uneventful, and he was discharged on June 26, 1967 to return to restricted duty with a left peroneal nerve injury resulting in a partial neuropathy of the left peroneal nerve.

35. On November 1, 1967, on a referral from the Rader Clinic at Fort Meyer, Virginia, MacDonald was referred to Walter Reed Army General Hospital (WRAGH) for a neurosurgical consult. The reason for the request was paresthesia and burning from scar at anterior (situated at or directed toward the front) mid left leg, as well as for complaints referable to the right leg.

36. On November 1, 1967, a provisional diagnosis of nerve irritation and regeneration was made at WRAGH.

37. On November 6, 1967, a final diagnosis at WRAGH was made that the neuroma in the scar over the left lower leg is very sensitive to direct pressure and an elective revision of the neuroma was recommended.

38. On January 23, 1968, MacDonald was admitted to WRAGH with a diagnosis of traumatic neuroma, left superficial nerve. His chief complaint on admission was that he developed a painful neuroma and could not wear a combat boot and he wanted the neuroma removed or repaired in order to facilitate his wearing a boot.

39. On admission at WRAGH, a physical exam revealed a palpable neuroma at the distal one-third of the left leg in the course of the superficial peroneal nerve with a Tinel sign listed at the scar. Sensation of the lateral foot and over the medical aspect of the foot was normal. All other

neurological inventory and general physical exam was within normal limits.

40. On January 31, 1968, a neurectomy of the left superficial nerve was performed under local anesthesia.

41. The excision of the traumatic neuroma (neurectomy) of the left peroneal nerve gave MacDonald relief from the pain and he was discharged from WRAGH on February 1, 1968. The only limitation placed on him was no prolonged marching.

42. On June 20, 1968, MacDonald was seen at WRAGH on follow up exam. The examining physician noted that MacDonald had a recurrence of pain in his left leg from the shrapnel wound, aggravated by excessive exercise.

43. On August 9, 1968, it was determined that MacDonald was medically qualified for restrictive duty. The only limitation placed on him was no prolonged marching or standing and he was instructed not to wear boots.

44. On January 4, 1969, MacDonald was seen in an orthopedic consultation at WRAGH. The referring physician noted progressive muscle and nerve regeneration in both legs since February 1968.

45. The consulting orthopedist noted that MacDonald's chief complaint referable to the left leg was a burning sensation with significant swelling occurring after physical exercise and leg cramps. The examiner noted that MacDonald walked without a limp but that he complained of foot dropping after increased activity.

46. The physical exam performed on January 4, 1969, revealed the presence of a 3 x 3 inch area at the anterior lateral part of the tight, shiny, dry skin. This condition has been present continuously from 1968 until the present time. Increased sensation over the dorsum of the left foot was also noted, and this has been a constant condition from the date of his wound until the present time. His left calf measured 16¼".

47. On February 20, 1969, the determination of medical qualification made on August 9, 1968, was again renewed.

48. On June 6, 1969, during his separation physical at the Rader Clinic, it was determined that MacDonald was suffering from an arterio-venous fistula (AV fistula) of the tibial artery, anterior or posterior or both. The examining physician noted that the AV fistula was the cause of many of the symptoms to the left leg as well as the complaint of shortness of breath on exercise when MacDonald would walk more than a half mile or up a hill as well as the burning in the leg. He was referred to the Cardiology Clinic at WRAGH for diagnostic studies and further evaluation.

49. On June 9, 1969, MacDonald was seen for a consultation at WRAGH in the Vascular Surgery Clinic because of his persistent complaints that his left leg was more prominent than his right for about a year, as well as being warmer than the right.

50. The examining physician in the Vascular Clinic found that both femoral pulses were easily palpable and no bruits were heard in this area. Both popliteal pulses were palpable. There was an ill-defined mass pulsatile with a systolic and diastolic bruit in the left lateral aspect of the lower leg. Both pedal pulses were present symmetrically with no definite thrill (a vibration felt by the examiner on palpation) in the area. Compression of the area of bruit caused diminution of approximately 8 beats per minute.

51. Based on these findings, a diagnosis of post traumatic AV fistula (malfunction) of the anterior fibial artery was made and it was recommended that MacDonald be scheduled for a left femoral arteriogram.

52. On June 18, 1969, MacDonald was admitted to WRAGH for the performance of a left femoral arteriogram. The admission physical confirmed the findings of June 9, 1969 and noted good dorsal flow.

53. On June 19, 1969, a left femoral arteriogram was performed at WRAGH which confirmed the diagnosis of a left AV fistula of the anterior tibial artery with no anterior tibial flow below the AV fistula site.

54. On June 21, 1969, the vascular surgeon read the x-rays and noted that the AV

fistula to be of the posterior tibial artery at the junction of M/3 and D/3 of the left leg. He scheduled MacDonald for surgery on July 22, 1969.

55. MacDonald had good distal pulses of the left lower extremity which were noted by his attending physician.

56. MacDonald was discharged from WRAGH on June 20, 1969.

57. On July 21, 1969, MacDonald was readmitted to WRAGH for repair of the AV fistula. He had no symptoms referable to the AV fistula listed on his admission physical exam. The admitting nurse stated that he was in no apparent distress.

58. On July 22, 1969, the AV fistula was repaired and the metal fragment in the area related to the AV fistula was removed. The left posterior tibial artery and vein were ligated.

59. On August 2, 1969, during his convalescence at WRAGH, the calf on MacDonald's left leg measured 15¼ " at a point 12 " above lateral malleous distally.

60. MacDonald was discharged from WRAGH on August 30, 1969, after completing a convalescence leave. His condition was that he could either return to duty or could be discharged.

61. MacDonald elected to take the discharge under a hardship category because of the terminal illness of his mother-in-law.

62. On September 4, 1969, he was given a follow-up exam and was referred to the USVA for evaluation and follow-up as needed. The prognosis for MacDonald was excellent, with no evidence of any residual problems or symptoms.

63. On September 11, 1969, MacDonald returned to WRAGH for a routine post-op visit. He had both femoral and popliteal pulses present, together with a strong left dorsalis pedis. He had an absent posterior tibial pulse. There was a slight area of erythema (redness) surrounding the operative site with some residual firmness of the underlying tissue.

64. On October 1, 1969, MacDonald had his separation physical and at that time he had no residual pain, swelling or complaints except for the numbness in the lateral lower left leg.

65. On October 31, 1969, MacDonald took a pre-employment physical for employment at Emery Air Freight which was conducted by F.X. Kranick, M.D. In his examination Dr. Kranick noted that MacDonald had normal extremities and reflexes but abnormal skin (without describing the nature or location of the abnormality). He also noted the absence of varicose veins. He described MacDonald's appearance as healthy.

66. Dr. Kranick noted that, from a physical point of view, the only significant findings were the multiple well-healed, non-draining scars from multiple shell fragment wounds. He indicated that MacDonald's "ability to perform as supervisor of the mail room will be qualified by the amount of time he has to spend on his feet, and by his own personal capability relative to standing this sort of stress." Dr. Kranick indicated that he felt "that a final decision will have to be made after" MacDonald's "performance of the next sixty days." Dr. Kranick concluded that MacDonald was employable.

67. On November 3, 1969, MacDonald commenced his employment at Emery Air Freight as a supervisor of the mail room.

68. MacDonald was continuously employed at Emery Air Freight from November 3, 1969, until July 20, 1984, when he resigned to assume a position as a letter carrier with the United States Postal Service (USPS).

69. At the time of his hiring by USPS, MacDonald had a pre-employment physical which revealed no physical problem or condition other than the permanent paresthesia over the dorsum (the back) of the left lower extremity.

70. During his tenure with Emery, MacDonald was off work in December 1974, because a dermatitis of the left leg with pain developing while he was hospitalized.

71. MacDonald was seen at the United States Veterans Administration in Wilkes-Barre (USVAH-WB) on July 12, 1974, when he appeared for emergency outpa-

tient treatment because in the last few days he had developed a superficial ulcer in the left lower leg with some drainage and brief period of swelling on the anterior lateral aspect. An exam taken on that date showed the presence of a foreign body in the leg. There was no evidence of any acute injury. MacDonald was given antibiotics. A copy of the report was directed to be sent to Col. Rich, the physician in charge of MacDonald's care at WRAGH. No copy received at WRAGH or by Col. Rich.

72. MacDonald was again seen at USVAH–WB on July 23, 1974, when he presented himself at the outpatient clinic with edema of the left lower leg with superficial ulceration and skin lesion of 4–5 toes of left foot. He was referred to Dermatology.

73. On July 23, 1974, upon referral from the outpatient clinic at USVAH–WB, MacDonald was seen in the Dermatology Clinic, where stasis dermatitis of the left leg and foot was diagnosed as secondary to multiple shrapnel flesh wounds. He was told to apply Aristocort cream and to use an elastic stocking, and instructed to return August 6, 1974.

74. On August 6, 1974, MacDonald returned to the Dermatology Clinic at USVAH–WB where the examining physician noted that the stasis dermatitis had healed and referred him to Prosthetics Clinic, where MacDonald was given an elastic stocking. MacDonald was instructed to return to the Dermatology Clinic on September 10, 1974.

75. On August 6, 1974, MacDonald was also referred by the examining physician in the Dermatology Clinic to the Diabetes Clinic, where he was examined and given a 1200–calorie diet for weight reduction. MacDonald also received an elastic stocking, and was measured for a more precise-fitting elastic stocking.

76. On September 10, 1974, MacDonald returned to the Dermatology Clinic at USVAH–WB, where it was observed by the examining physician that the eruption had improved except for a small area on his hand. Because of what the examining phy-

sician described as bizarre symptoms in his right leg, he was referred to the Neurology Clinic.

77. At this visit to USVAH–WB, the examining physician directed that a copy of the medical records at WRAGH be obtained to be placed in MacDonald's file at the USVAH–WB. The records from WRAGH were never obtained and, therefore, were not available to the subsequent examining and treating physicians of MacDonald at USVAH–WB.

78. On October 10, 1974, an eruption was observed on his left leg. Therefore, the examining physician in the Dermatology Clinic at USVAH–WB changed MacDonald's medication.

79. On December 4, 1974, at his visit to the Dermatology Clinic at USVAH–WB, it was noted that the dermatitis on his left leg persisted and the medication for application was again changed.

80. On February 27, 1978, when MacDonald again presented himself at the Dermatology Clinic at the USVAH–WB, the examining physician noted that the dermatitis had recurred at the post op site on the left leg. Aristocort was again prescribed for application and the condition resolved itself.

81. MacDonald had no further complaints referable to the lower left leg which were treated at USVAH–WB until January 23, 1986, when he was seen in the Primary Care Clinic of that hospital, when it was noted that he was complaining of pain in the left leg radiating up to the knee. The examining physician noted that MacDonald gave a history that six months ago MacDonald started to complain of cramps in his left calf while walking up stairs, steep hills, or very briskly on a level surface. This did not cause MacDonald to stop walking but merely to slow down until the cramps ceased. MacDonald's present complaint for which he presented himself was local tenderness.

82. MacDonald continued to work as a letter carrier from July 21, 1984, until March 23, 1986, and was able to perform

his duties and to fulfill his employment obligations.

83. On January 24, 1986, MacDonald was seen in orthopedic consultation with H.A. Smith, Jr., M.D. at the USVAH–WB who, after examining him, referred MacDonald to the Vascular Clinic at the hospital.

84. On February 24, 1986, MacDonald was seen in the Outpatient Surgical Clinic at the USVAH–WB by Juan DeRojas, M.D., who was a full-time employee of the defendant, United States of America.

85. Dr. DeRojas noted that MacDonald's chief complaint was "heaviness in the left calf" and further noted that he had a history of an AV fistula which had been surgically treated by ligation.

86. Dr. DeRojas on this initial exam noted that MacDonald had a good dorsalis pedis pulse but no posterior tibial pulse with slight increase in volume of left lower leg.

87. On March 17, 1986, Dr. DeRojas noted that the Doppler showed drop in left calf pressure. He noted that MacDonald had pain in his left leg especially in calf area that increases with exercise. He claimed that leg was warmer with prominent superficial veins. Dr. DeRojas arranged for MacDonald to be admitted for a left femoral arterial tibial artery by-pass which was performed on April 2, 1986, using a reverse saphenous vein graft.

C. Medical History—Post–Operative.

88. After the surgery, MacDonald developed swelling, pitting edema and severe dermatitis in his left leg.

89. Because of the swollen left leg with plus (+) 2 pitting edema which was apparent on April 9, 1986, MacDonald's discharge from USVAH–WB was postponed.

90. When MacDonald was finally discharged on April 16, 1986, he was not permitted to return to work for at least ninety (90) days. He was instructed to return to the Surgery Clinic for follow-up visits.

91. On September 19, 1986, MacDonald was seen in the Surgical Clinic at the USVAH–WB, where his condition was diagnosed as severe chronic venous insufficiency of the left leg, which is a permanent disability, and the doctor stated that MacDonald was unable to resume his previous employment or an employment requiring standing. He was advised by the examining physician to undergo extended bed rest with elevation of his left leg.

92. On September 19, 1986, MacDonald was seen at the Surgical Clinic of the USVAH–WB where examination noted improvement. He still had edema in the left leg. The examining physician noted that MacDonald would be unable to work at any position requiring prolonged sitting or standing because he is compromised by the permanent disability. The examining physician noted that MacDonald would have to develop collateral venous channels to handle the increased arterial inflow.

93. Despite the continuous presence of stasis dermatitis since April 3, 1986, MacDonald was first referred post op to the Dermatology Clinic on October 1, 1986.

94. On May 8, 1987, MacDonald was seen in the Surgical Clinic at USVAH–WB where he was diagnosed as having symptoms of venous incompetence. A doppler study was found to be inconclusive and it was recommended that MacDonald be further evaluated.

95. At the order of the examining physician, a venogram was performed on MacDonald on June 2, 1987, and on June 5, 1987, MacDonald returned to the previous examining physician and Dr. DeRojas. Their interpretation of the venogram was:

A. Deep veins are normal.

B. Evidence of tortuous superficial veins in area of calf.

C. No evidence of an AV fistula or venous blockage.

D. Incompetent perforating veins in the area of the leg.

E. Previous resection of saphenous vein.

Based on these interpretations, Dr. McKeown (the previous examining physician) and Dr. DeRojas diagnosed MacDonald's condition as being the result of incompetent valves.

96. On July 31, 1987, MacDonald was examined in the Surgical Clinic at USVAH–WB and it was found that he was one hundred percent (100%) disabled from any type of working activity.

97. At the same examination on July 31, 1987, it was determined and diagnosed that after the surgery of April 2, 1986, not enough blood was pulled off through the deep vein system to the upper leg because there was no developed superficial or collateral veins to return the blood from the deep systems to the upper leg.

98. On August 13, 1987, when MacDonald was seen at the Surgical Clinic, the previous venograms were reviewed and the examining physician noted that there were extensive collaterals and tortuous superficial veins but the deep system was not well visualized below the distal one-third of the lower leg.

99. On January 31, 1990, MacDonald was referred by his family physician, Thomas F. Artabane, M.D., to the Milton S. Hershey Medical Center in Hershey, Pennsylvania, for evaluation and pain management.

100. At the Hershey Medical Center (HMC), MacDonald was placed on the service of Brian L. Thiele, M.D., the Chief of Vascular Surgery.

101. On January 31, 1990, the physical exam noted tortuous varicose veins over the posterior calf with a palpable dorsalis pedalis pulse and a weak palpable posterior tibial pulse.

102. A venogram was performed at HMC on January 31, 1990, and dilated superficial perforating veins were seen in the left lower leg. The deep venous system was diagnosed as normal.

103. Based upon the exam and venogram, a Doppler study was ordered which was performed on January 31, 1990. Duplex scanning was performed bilaterally over the proximal deep veins of the lower extremities. Venous refill-timing was performed with and without tourniquet bilaterally.

104. The Doppler study of January 31, 1990, showed that the right leg refill times were within normal limits with no apparent valvular incompetence in the deep superficial system. However, on the left calf, while there was satisfactory emptying, the refill times were remarkably shortened with and without tourniquet applications.

IV. *Discussion.*

A. Professional Malpractice.

■ In order to establish a case of medical malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause of, or a substantial factor in bringing about, the harm suffered by the patient and (4) damages suffered by the patient that were a direct result of that harm. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888, 891 (1990).

■ A plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Id.,* 584 A.2d at 892; *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980). Professional negligence or malpractice may also be simply described as the failure to exercise ordinary care under the circumstances. *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 508–9, 559 A.2d 550 (1989).

■ Plaintiff first contends that defendant's surgeon was negligent in proceeding to surgery without first having obtained and reviewed all of MacDonald's medical records documenting his extensive medical history beginning with his war injuries to his left leg. It is true that Dr. DeRojas did not obtain and review MacDonald's complete medical history. However, the court is persuaded that plaintiff's medical history, while extensive as regards the vascular system of his left leg, would not have presented a contra-indication to surgery, and would not have materially affected the surgery or the decision to proceed with

surgery, in light of the information which was available to the surgical team.

■ Secondly, plaintiff contends it was negligent not to administer a venogram pre-operatively. However, the court is persuaded by the weight of the credible expert testimony that a pre-operative venogram was an inappropriate and unnecessary procedure. The essential information was obtained primarily through a Doppler study providing ambulatory venous pressure data and an arteriogram.

Plaintiff has not contended that the surgery itself was performed improperly. Indeed, there was no evidence supporting any such contention. It was fully acceptable medical practice to utilize the greater saphenous vein of the same leg for the graft to effect the arterial bypass.

■ Plaintiff further contends that it was negligent for the defendant's vascular surgery team to proceed with the arterial bypass operation rather than to elect more conservative nonsurgical treatment, given the patient's symptoms and test results presented to them prior to surgery.

Defendant, on the other hand, contends that this is an appropriate situation for application favorable to the defendant of the so-called "two schools of thought" doctrine first set out in the early cases of *Remley v. Plummer*, 79 Pa. Super. 117 (1922) and *Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935). The rule as stated in *Duckworth* is as follows:

> Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by considerable numbers of his brethren in good standing in his community.

320 Pa. 47, 51, 181 A. 558, 559 (1935).

The rule has been restated with a slight variation in more recent cases:

> The rule is that, where competent medical authority is divided, a physician will not be liable if in the exercise of his judgment he followed a course of treatment supported by reputable, respectable, and reasonable experts. *Brannan*

*v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980); *Tobash v. Jones*, 419 Pa. 205, 213 A.2d 588 (1965).

*Furey v. Thomas Jefferson University Hospital*, 325 Pa.Super. 212, 224, 472 A.2d 1083, 1089 (1984).

A recent Pennsylvania case close in point is that of *Trent v. Trotman*, 352 Pa.Super. 490, 508 A.2d 580 (1986). In that case, as with the instant case, the question presented to the fact finder was whether or not the physician should proceed with surgery or a more conservative course of nonsurgical treatment, given the symptoms and test results presented. In *Trent*, during the initial surgical procedure, the plaintiff incurred a perforated sigmoid colon, which was diagnosed promptly. Following five days of intravenous treatment with antibiotics, the plaintiff was again subjected to surgery, and the perforation of his colon was repaired. Plaintiff contended it was negligent for the surgeon to delay surgery rather than to proceed immediately with the repair surgery upon making the diagnosis. The court affirmed the trial court's instruction to the jury on the "two schools of thought" doctrine.

Similarly, in *Furey v. Thomas Jefferson University Hospital, supra,* the court held it reversible error for the trial court to fail to instruct the jury on the "two schools of thought" doctrine. The issue was whether or not surgical intervention was appropriate, given a finding of a severe bacterial infection.

In the instant case, the court, being the fact finder, must apply the "two schools of thought" doctrine and determine whether the defendant surgical team is entitled to its benefits.

Here, competent medical authority was divided as to whether or not surgery was an appropriate treatment of MacDonald, as opposed to the more conservative, nonsurgical treatment, given the patient's symptoms and test results presented prior to surgery.

The surgeon, Dr. DeRojas, of course, determined the surgery to be appropriate. Plaintiff's expert witness, a fully qualified

vascular surgeon, Dr. Jeffrey R. Alpert, opined that the surgery was not appropriate, and that conservative, nonsurgical treatment should have been undertaken. On the other hand, Dr. Vincent dePaul Larkin, one of defendant's surgical experts, testified that, while the vast majority of arterial bypass surgical patients have limb-threatening ischemia (not the case with MacDonald) there is also a subset of eligible patients, such as MacDonald, who are relatively young claudicators, otherwise in good health, whose claudication is severe enough to affect the patient's lifestyle or job. In such an instance he testified, the majority of authorities make it an acceptable procedure. This view was echoed in testimony of defendant's other highly qualified vascular surgeons.

Conservative, non-surgical treatment would have included continued walking exercise, medication (of questionable value), weight reduction and a cessation of cigarette smoking.

Although more than one of the experts indicated a personal preference for trying the more conservative approach first, the court finds that surgery under the conditions and history presented was an acceptable alternative course of treatment supported by reputable, respectable and reasonable medical experts.

The court, therefore, further finds that Dr. DeRojas was not negligent in proceeding with the arterial bypass surgery.

B. Informed Consent.

■ The only evidence presented at trial pertaining to the issue of informed consent was the testimony of the plaintiff, MacDonald and that of Dr. Carlos Sicilia and Dr. Stephen Y. Cesar, surgical residents (both by deposition). Their testimony was plausible, consistent, uncontradicted and must be considered factual.

MacDonald testified that on March 26, 1986, three days after he was admitted to the hospital, he had a conversation with Dr. DeRojas, the operating vascular surgeon. At that time Dr. DeRojas confirmed his admission diagnosis of an occlusion of the left femoral popliteal artery. He further advised MacDonald that he recommended an arterial bypass. He briefly described the operating procedure to MacDonald, including the fact that they would be removing a vein, reversing it and tying it in as an artery to eliminate plaintiff's symptoms by restoring full blood flow to his lower left leg. Dr. DeRojas did not explain to MacDonald any of the risks of the surgery, any of the alternatives to the surgery or any possible consequences of having no surgery.

The same day MacDonald was seen by Dr. Cesar, who told MacDonald essentially the same things as Dr. DeRojas and advised that they would be using a saphenous vein for the bypass. When MacDonald asked whether plastic could be used, Dr. Cesar advised that would not be indicated. Again, Dr. Cesar explained no risks of surgery nor any alternatives to surgery, and no risks of having no surgery.

On April 1, 1986, the day before the surgery, Dr. Sicilia introduced himself to MacDonald as being a surgical resident on board as part of a rotation program. Dr. Sicilia reinforced what the other two doctors had told MacDonald, and further indicated that MacDonald would be carrying the mail again in about two to three weeks, that the operation would be a "piece of cake" and that as a result, MacDonald would be "better than he ever was." Again, Dr. Sicilia set forth no risks of the surgery, no alternatives to surgery nor any risks of not proceeding with the surgery. Dr. Sicilia obtained MacDonald's signature on the printed hospital consent form, entitled "Request for Administration of Anesthesia and for Performance of Operations and Other Procedures." (Government exhibit 6, p. M-2.)

This printed form described the operation as a "left popliteal to peroneal bypass arterial graft." Under the heading "Statement of Request" the form includes the following material statements in addition to a request for the performance of the surgery:

1. The nature and purpose of the operation or procedure, possible alternative methods of treatment, the risks involved,

and the possibility of complications have been fully explained to me. I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure. I understand the nature of the operation or procedure to be [ ], which is to be performed by or under the direction of Dr. DeRojas or Dr. Sicilia or any of his associates as designated by the Chief of [illegible].

Above the signature of Dr. Sicilia appears the following statement:

I have counseled this patient as to the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above.

Above the signature of MacDonald appears the following statement:

I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above and hereby request such procedure(s) be performed.

MacDonald's testimony is in stark contradiction to the reassuring statements contained on the printed consent form. Dr. DeRojas was not present when the consent form was signed, and, although he testified at trial, his testimony did not include any statements relevant to the issue of informed consent.

MacDonald's testimony is found to be a correct description of what took place; the printed words on the form do not reflect what, in fact, occurred prior to execution of the consent form.

It is clear that MacDonald wanted relief from the pain in his leg and requested that the arterial bypass surgery be performed, with the expectation that it would relieve the pain and solve his problem. However, it is equally clear that while he was advised of the reason for the operation and the nature of the procedure, he was not advised of any of the risks attendant to the operation nor any of the alternatives to surgery nor the risks attendant with such alternatives.

The court, therefore, can only conclude that the arterial bypass surgery was performed without the informed consent of the patient, MacDonald. While he obviously consented to the operation and was fully competent to give his consent, he did so in complete ignorance of the risks and possible alternatives.

In *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647–649 (1971), the Pennsylvania Superior Court made the following statement concerning the requirement of informed consent prior to statement concerning the requirement of informed consent prior to surgery:

The law in this Commonwealth is that where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, his 'informed consent' . . . ., is a prerequisite to a surgical operation by his physician. An operation without such informed consent is a technical assault, making the physician liable for any injuries resulting from the invasion, regardless of whether the treatment was negligently administered.

The court, in *Cooper*, went on to state its formulation of the so-called "prudent patient" standard of determining whether or not informed consent has been provided to a patient:

. . . whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. . . . The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment.

*Cooper v. Roberts, supra,* 286 A.2d at 650–651.

Subsequent cases have simply reinforced and elaborated upon this test:

The standard of care is not what a reasonable medical practitioner would have done in the situation but whether the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment.

*Festa v. Greenberg,* 354 Pa.Super. 346, 511 A.2d 1371, 1373 (1986) *allocatur denied,* 515 Pa. 580, 527 A.2d 541 (1987). See also *Jozsa v. Hottenstein,* 364 Pa.Super. 469, 528 A.2d 606 (1987) *allocatur denied,* 518 Pa. 619, 541 A.2d 746 (1988).

In the instant case, several highly qualified vascular surgeons testifying as experts stated what they considered would have been material risks which should have been disclosed to MacDonald. These risks included death, loss of limb, infection, and allergic reactions to anesthesia and other medication. Conservative treatment in lieu of surgery may have included a prohibition of smoking, control of cholesterol, exercise to the point of claudication, and certain medication.

Most reported cases involve some form of risk disclosure and the need for an evaluation by the trier of fact as to whether or not the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment.

Here, there clearly were material risks and alternatives to the surgery, all fully established by expert medical testimony. See *Festa v. Greenberg, supra.* It is equally apparent that no risks and no alternatives were described to MacDonald by any member of the surgical team prior to surgery.

Thus, the physicians and the defendant are necessarily liable for "any injuries resulting from the invasion." *Cooper v. Roberts, supra,* 286 A.2d at 649.

### C. Causation.

■ The issue of causation in an informed consent case was explored at great length in *Salis v. United States,* 522 F.Supp. 989 (M.D.Pa.1981), a case strikingly familiar to the instant case in several respects.

In that case, an angiogram procedure dislodged plaque from the walls of Salis' blood vessels causing massive clotting, eventually resulting in the amputation of Salis' left leg. While the court found that the procedure had not been performed negligently, it did find a lack of informed consent and that Salis' serious injuries were caused thereby. In *Salis,* the court adopted the standard for a causal relationship determination set forth in *Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir.1972), *cert. denied* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). The *Canterbury* decision was described in *Salis* as a watershed opinion on the issue of informed consent, indicating that the court in *Canterbury* concluded that a "causal relationship" must exist between the physician's failure to disclose and the complainant's agreement to undergo the procedure which gave rise to the surgery.

> Consequently, *Canterbury* held that to recover under the theory of informed consent, the complainant must prove that 'a prudent person in the patient's position' would not have assented to the treatment 'if suitably informed'.

*Salis v. United States, supra,* 522 F.Supp. at 1002.

While the *Salis* court indicated that "several Pennsylvania decisions have adopted this rule," *Id.,* it implemented the *Canterbury* analysis by first carefully reviewing the particular circumstances at issue in light of two United States District Court cases not applying Pennsylvania law, *Dewes v. Indian Health Service,* 504 F.Supp. 203 (D.S.D.1980), and *Dessi v. United States,* 489 F.Supp. 722 (E.D.Va. 1980):

> Read together, *Dewes* and *Dessi* established three primary factors that the trier-of-fact must examine to determine if causation exists. At the outset, the court must look to the *degree of risk* actually involved in the relevant procedure. The percentage of peril must be compared to the *likelihood of benefit* from the therapy and the *type of alternatives* that present themselves.

*Salis, supra,* 522 F.Supp. at 1003. (Emphasis original)

In *Salis,* the risk of significant complications in the case of an average angiogram was placed in the vicinity of one to two percent. One of the known risks of the procedure not disclosed to the patient was

the creation of a clot caused by the breaking off of plaque that had collected along the vessel walls.

In the instant case, unlike *Salis*, the post-operative disabling pain experienced by MacDonald, whether or not based on venous insufficiency, was not a risk that any of the testifying physicians would have disclosed as a possible risk of the surgery. In this respect the case is more similar to *Dessi v. United States, supra,* as to which the *Salis* court ascribed a minuscule percentage of risk. In that case the physician employed by the Public Health Service performed a transurethral resection to remove an obstruction from the plaintiff's prostate. The operation unfortunately caused impotence, the objective risk of which, at the time, had been considered slight. In *Dessi* the court found for the defendant on the causation issue, having determined that under the circumstances a "prudent person" informed of this risk would have elected the treatment.

Regardless of how the *Canterbury/Salis* formulation would be applied in this case, it is apparent from subsequent Pennsylvania appellate cases that the *Canterbury/Salis* formulation does not now represent the law of Pennsylvania.[8] While not referring to these federal court cases, the Pennsylvania Superior Court has set forth an entirely different formulation:

> Recovery is based on the administration of surgical procedure in the absence of the patient's informed consent, not on whether the patient would not have gone through with the operation if warned of a particular danger. As a practical matter, an operation performed without informed consent is a technical battery, which makes the physician liable for any injuries resulting from that invasion.

*Sagala v. Tavares,* 367 Pa.Super. 573, 580–581, 533 A.2d 165, 169 (1987) *allocatur denied,* 518 Pa. 626, 541 A.2d 1138 (1988).

The Pennsylvania Superior Court reaffirmed its opinion in *Sagala* in *Gouse v. Cassel,* 385 Pa.Super. 521, 561 A.2d 797

(1989) *appeal granted,* 524 Pa. 608, 569 A.2d 1367 (1989). In that medical malpractice action, the Superior Court reversed the judgment of the trial court and remanded for a trial solely to determine the amount of damages to be awarded to the plaintiff, holding it error for the trial court to have submitted the following second or causation interrogatory to the jury:

> 2. If you find that the plaintiff was not advised of those material facts, risks, complications and alternatives to the surgery, do you find that a reasonable man having [plaintiff's] diagnosis and [plaintiff's] condition would have agreed to undergo the operation nevertheless.

*Id.* 561 A.2d at 798.

In its opinion the Superior Court cites with approval the notes of the Civil Instructions Subcommittee of the Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions found in the Pennsylvania Suggested Standard Civil Jury Instructions following Section 10.06A:

> No instruction on legal cause should be given on an informed consent claim. Because a doctor is deemed to have committed a battery by treating a patient without his informed consent, a patient need not establish a causal relationship between the doctor's failure to inform and the injury suffered by him. In other words, a patient can sustain a successful claim without having to show that if adequately informed of the risks which led to his injuries he would not have consented to the treatment.

*See Gouse v. Cassel, supra,* 561 A.2d at 798–799. *Sagala* and *Gouse* were reaffirmed by the Pennsylvania Superior Court, *en banc,* in *Millard v. Nagle,* 402 Pa.Super. 376, 587 A.2d 10 (1991).

Therefore, it makes no difference in this case that MacDonald "wanted it fixed" and that if fully informed of the possible adverse results and dangers of the proposed surgical procedure as well as the alternative methods of treatment which were available, he (or a reasonable person in his

---

**8.** When *Salis* was decided, in 1980, the court did not have the benefit of the Pennsylvania Superior Court's view of the law of Pennsylvania as subsequently expressed in *Sagala, Gouse* and *Millard, infra.*

position) would have nevertheless given his consent. MacDonald did not give an informed or knowledgeable consent to the physician's proposed course of treatment. In proceeding with the surgery without first obtaining MacDonald's informed consent, Dr. DeRojas proceeded, in legal effect, with no consent. The defendant is, therefore, liable to MacDonald for any damages which result from that course of treatment regardless of the care exercised in its performance.

### V. *Damages.*

As liability is based on the absence of informed consent, the court in determining damages must first determine what injuries "resulted from the invasion." *Cooper v. Roberts, supra.*

On the one hand the surgery was successful, in that the arterial graft "took" and full arterial blood flow was restored to MacDonald's lower left extremity. However, the operation required lengthy incisions and caused considerable pain, edema and dermatitis during an extended recuperative period.

Subsequent to what may be considered an extended but normal recuperative period, MacDonald continued to suffer pain in his lower left extremity, and the same has now left him essentially disabled. He has not been able to return to his employment as a mail carrier, nor has he been able to sustain other employment since the operation, which took place nearly three and one-half years prior to the trial.

The precise physiological basis for the current continuing pain being experienced by MacDonald in his lower left extremity remains a mystery. MacDonald has claimed that it is due to venous insufficiency created by aggravation of his prior condition as a result of the surgery. However, the most recent and most thorough testing in this regard, being that conducted at the Hershey Medical Center, showed no evidence of venous insufficiency. The deep veins are working properly, carrying the blood back to the heart in sufficiently proper fashion so as not to be the source of significant pain.

Dr. Anthony J. Comerota, a highly qualified surgeon who had examined MacDonald post-operatively, found no evidence of any serious vein problem, although he did find some mild venous insufficiency, in that some valves were not working properly and some varicosities were present. He opined, to a high degree of medical certainty, that MacDonald's disabling symptoms were not due to venous insufficiency. Rather, he expressed the view that the pain could be due to a chronic muscle compartment syndrome. However, no test for chronic compartment syndrome was conducted. He further opined that the arterial bypass may have exacerbated the chronic compartment syndrome by increasing the blood flow to the muscles. Muscles expand with increased blood flow and, if the cellophane-like material within which they are encased does not expand accordingly, disabling pain can result.

As the physicians do not know why MacDonald continues to suffer such pain, they are unable to recommend a course of treatment likely to alleviate the pain. As it now stands, MacDonald faces continuing pain and resultant disability for the remainder of his life.

While the etiology of MacDonald's current symptoms is unclear, it is at least apparent to the court that he did not have these symptoms immediately prior to the surgery. The claudication pain which he experienced prior to the surgery was different from the disabling pain he is now experiencing.

The court finds by a preponderance of the evidence that the surgery, even though properly performed, was a substantial factor in bringing about MacDonald's subsequent and current physical difficulties even though the precise medical basis for that causal link has not been established.

### VI. *Conclusions of Law.*

1. Defendant's medical staff at the VA Medical Center was not negligent in determining that arterial bypass surgery was indicated for MacDonald.

2. Defendant's medical staff at the VA Medical Center performed the arterial bypass surgery properly, without negligence.

3. MacDonald did not give informed consent to the arterial bypass surgery.

4. The defendant is liable to MacDonald for injuries caused by the surgery.

5. The surgery was a substantial factor in bringing about MacDonald's post-operative disabling pain and other abnormal post-operative symptoms.

\* \* \*

The court, in its pre-trial order of June 26, 1990, directed that the trial be bifurcated with respect to liability and damages. Therefore, the court will fix a date to receive further evidence on damages. However, as set forth in that order, testimony received during the liability phase from physicians and certain laymen will be considered part of the record for the damage phase.